James S. SCOTT, Regional Director of the Thirty-Second Region of the National Labor Relations Board for and on behalf of the National Labor Relations Board, Petitioner,

v.

BROTHERHOOD OF TEAMSTERS AND AUTO TRUCK DRIVERS, LOCAL NO. 70 OF ALAMEDA COUNTY, I.B.T.C.W. H.A., Respondent.

No. C–85–5706 RFP.

United States District Court, N.D. California.

Oct. 22, 1985.

Duane B. Beeson, Beeson, Tayer & Silbert, San Francisco, Cal., for Broth. of Teamsters and Auto Truck Drivers, Local No. 70 of Alameda County.

James Paras, Morrison & Foerster, San Francisco, Cal., for respondent Sea-Land Services.

John M. Skonberg, Littler, Mendelson, Fastiff & Tichy, San Francisco, Cal., for respondent Chipman Freight Services.

## MEMORANDUM AND ORDER

PECKHAM, Chief Judge.

This case arises from a petition of the Regional Director of the National Labor Relations Board (NLRB) for issuance of a preliminary injunction under § 10(*l*) of the National Labor Relations Act ("NLRA" or the "Act"), 29 U.S.C. § 160(*l*), against Local 70 of the Brotherhood of Teamsters & Auto Truck Drivers ("Teamsters") to enjoin activity allegedly proscribed by NLRA § 8(b)(4)(B), 29 U.S.C. § 158(b)(4)(B). The petition alleges that two forms of picketing by the Teamsters violate this "secondary boycott" provision of the Act. The first consists of picketing by the union at Chipman Freight Services; the second involves picketing at Sea-Land Services.

The Court, having heard oral argument on the matter on August 26, 1985, and having fully considered the papers, declarations, and record in this case, finds that the Regional Director has failed to establish, under § 10(*l*) of the Act, reasonable cause to believe respondents have violated § 8(b)(4)(B). This order therefore denies the requested injunction with respect to picketing at Chipman. An injunction is granted with respect to picketing at Sea-Land to ensure that the union limits its picketing to activity associated with Chipman.

## FACTS

The facts alleged by the parties are not in substantial conflict. The drivers involved are owner-operators of trucks who haul containerized freight to and from the piers in the Port of Oakland. Prior to the

Barbara D. Davison, Paul Eggert, Veronica I. Clements, N.L.R.B., Oakland, Cal., for petitioner James B. Scott on behalf of N.L.R.B.

events described below, Chipman Freight Services had contracts with at least twenty-three such drivers to make pickups and deliveries, mostly within the immediate Port area. Chipman is a California corporation engaged in the transportation of freight and commodities for both domestic and foreign clients. The company has two terminals in Oakland.

On July 29, 1985, Chipman informed these drivers that they would have to sign new contracts in order to continue working for Chipman. The existing sub-haul contract between Chipman and the drivers specified that either party could immediately terminate the agreement at any time upon written notice. Aff. of Jon Tucker, Aug. 8, 1985, at 13–14, att. A. All but two of the twenty-three drivers refused to sign the new contracts on this date. Chipman has not provided additional work to those drivers who did not sign new contracts.

In their efforts to regain employment by Chipman, some of the drivers who refused to sign the new contracts on July 29, 1985, sought the assistance of the local Teamsters union which had already begun efforts to represent the approximately six hundred owner-operators in the Port area. In response to their request, the director of the owner-operator division of the Teamsters Local 70 attempted, on July 30, 1985, to convince the Chipman management to allow the drivers to return to work under the terms of their previous contracts. Chipman declined to rehire the truckers or to recognize the Teamsters as the truckers' representative. Decl. of Alex Ybarrolaza, Aug. 20, 1985, at 2–5. Employees of Chipman who work in the company's container freight station or who drive vehicles owned by the company are represented by another union.

On August 7, 1985, picketers appeared at both Chipman facilities carrying signs that read "Chipman Freight Services/Unfair to owner-operators/Teamsters Local 70." On the second day of picketing, the words "sanctioned by J.C. 7" were added at the bottom of the signs. Decl. of Tucker, Aug. 8, 1985, at 1–2. The picketing was conducted by the former Chipman owner-operator truck drivers.

Teamsters Local 70 claims to represent the owner-operators associated with approximately thirty-five facilities in the Port area. Nevertheless, the union maintains that the picketing by Chipman drivers is prompted entirely by their desire to return to work rather than to achieve company recognition of the union. A letter written August 15, 1985, from the director of the owner-operator division to the attorney for Chipman states, "Our picketing Chipman Freight Services is for the sole purpose of returning all of the Chipman owner-operators to their jobs and not for the purpose of gaining recognition." *See also* Resp. Memo. in Opp. to Injunction, at 3. The picketing at Chipman has continued on weekdays since August 7, 1985. Req. for Exp. Determ. by Charging Party, Aug. 27, 1985, at 2.

Chipman alleges that the effect of the picketing of its company's two terminals has been, *inter alia*, to coerce some of the owner-operators who would otherwise perform work for the company into not crossing the picket lines. Decl. of Thomas Longren, Aug. 9, 1985, at 1. Chipman summarizes the harmful effects of the picketing as follows: "The failure of [some of] Chipman's owner-operators and the trucking companies under contract with Chipman's customers to cross the picket lines at Chipman's facilities has caused Chipman's customers to withdraw work from Chipman and to threaten further cessation of business with Chipman." Req. for Exp. Determ. by Charging Party, Aug. 27, 1985, at 2–3.

The picketing related to Chipman operations also, at least initially, occurred at locations where Chipman trucks made pickups or deliveries. The pickets followed the trucks from Chipman to the other locations. One of these picketed facilities is Sea-Land Services. On August 8, 1985, Sea-Land established a "main gate" and a "reserve gate." A sign at the main gate stated that it was not to be used by Chipman drivers, whereas the reserve gate had a sign indi-

cating "Chipman drivers only." In two instances, picketers from Chipman picketed at both Sea-Land gates. An official associated with Sea-Land alleges that the Chipman-related pickets at Sea-Land caused certain drivers for Sea-Land to refuse to perform work, creating delays in delivery and pickup of freight. Decl. of A.S. Newson, Aug. 9, 1985, at 1–4.

The Teamsters assert that the instances where picketing occurred at the main gate of Sea-Land were in response to Chipman trucks driving through this entrance. Decl. of Terry Frame, Aug. 20, 1985, at 3–4. According to the director of the Teamsters owner-operator division, "Aside from these two incidents the picketing has been restricted to the separate gate, and in all cases has been directed solely at Chipman trucks." Decl. Ybarrolaza, Aug. 20, 1985, at 7. A notice from the Teamsters Business Representative at Sea-Land, addressed to Sea-Land Employees and distributed to members of Local 70 on August 13, 1985, states:

> The picketing which is being conducted by Teamsters Local 70 against Chipman is restricted to that employer. Picketing is carried on at Sealand only when Chipman drivers enter Sealand's premises and perform work. Local 70 is not requesting or encouraging any employee of Sealand or any person having business with Sealand, other than Chipman drivers, to stop or interrupt normal work.

Decl. of Marty Frates, Aug. 16, 1985, Exh. B.

## DISCUSSION

### The Standard of Review of the NLRB Petition

■ Section 10(*l*) of the NLRA, 29 U.S.C. § 160(*l*), provides that when the Board has "reasonable cause" to believe that an unfair labor practice is being committed, it must petition a United States district court for injunctive relief pending the final adjudication by the Board of the complaint. The standard of review the district court must employ is left to the equitable discretion of the court under the terms of § 10(*l*): "Upon the filing of any such petition the district court shall have jurisdiction to grant such injunctive relief or temporary restraining order *as it deems just and proper*, notwithstanding any other provision of law." 29 U.S.C. § 160(*l*) (emphasis added).

The Ninth Circuit's interpretation of this standard for review of a petition under § 10(*l*) establishes that a district court should accord deference to the initial determination of the NLRB of an unfair labor practice:

> The preliminary injunction should be granted by the court if the court finds that the factual allegations and the propositions of law underlying the regional director's petition are not insubstantial or frivolous so that he has reasonable cause for believing the Act has been violated, and if the court finds that injunctive relief is appropriate.

*San Francisco-Oakland Newspaper Guild v. Kennedy*, 412 F.2d 541, 544 (9th Cir. 1969). A subsequent Ninth Circuit opinion, *Kennedy v. Teamsters, Chauffeurs, Warehousemen & Helpers, Local 542*, 443 F.2d 627, 630 (9th Cir.1971), suggests that district court review of the regional director's petition should focus on whether he has made a *prima facie* showing of an unfair labor practice. This case cautions, however, that it is "... not for the District Court, at this stage, to resolve either the factual disputes or the legal issues involved." *Id.* at 630.

Notwithstanding a court's deference to the "reasonable cause" determination of a regional director of the NLRB that precedes his request for an injunction, the district court's review of the dispute must ensure that an injunction is legally warranted. As Judge Henderson observed in a recent case before this Court,

> ... this Court does not infer from *Kennedy* that our Circuit desires district courts to merely rubber-stamp every Board petition for an injunction pursuant to § 10(*l*) of the Act. Rather, the language of *Kennedy* must be read in the context of the statutory framework re-

quiring the Board to make a showing of "reasonable cause" to believe violation has occurred.

This Court also recognizes that strikes may settle by the time the Board holds its formal hearing on the complaint, rendering such a hearing or further action by the Board moot. Thus, the resolution of a § 10(*l*) petition may, practically speaking, dispose of the issues raised by the complaint.

*Miller v. Hotel and Restaurant Employees and Bartenders Union, Local 2, et al.,* 605 F.Supp. 573, 581 n. 46 (N.D.Cal.1985). *See also Retail Clerks Union v. Food Employers Council, Inc.,* 351 F.2d 525, 530 (9th Cir.1965) ("... Section 10(*l*) gives this discretion as to whether or not an injunction should issue to the district court, not to the Regional Director, and neither requires nor suggests that the court should abdicate its responsibility and adopt the proposal of the Regional Director.").

Consequently, although the district court's review of a petition under § 10(*l*) ought not attempt to resolve the merits of the NLRB's claim that an unfair labor practice exists, the court nevertheless must examine closely the soundness of the Regional Director's legal position. Indeed, Judge Friendly's careful analysis of the legislative history of § 10(*l*) led the Second Circuit in *Danielson v. Joint Board of Coat, Suit and Allied Garment Workers' Union,* 494 F.2d 1230, 1245 (2d Cir.1974), to conclude that if a district court is "convinced" that the NLRB's legal position is wrong, it should not issue an injunction under § 10(*l*).[1]

### The Regional Director's Petition and Picketing at Chipman

The legal argument made by the NLRB's Regional Director in this case purports to demonstrate that the NLRB has "reasonable cause" to believe that the Teamsters have violated § 8(b)(4)(B) of the NLRA. This section provides that it shall be an unfair labor practice for a labor organization or its agents:

(i) ... to induce or encourage any individual employed by any person engaged in commerce ... to engage in a strike or a refusal in the course of his employment to ... transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services; or (ii) to threaten, coerce, or restrain any person engaged in commerce or in any industry affecting commerce, where in either case an object thereof is:

\* \* \* \* \* \*

(B) forcing or requiring any person to cease ... doing business with any other person ... *Provided,* That nothing contained in this clause (B) shall be construed to make unlawful, where not otherwise unlawful, any primary strike or primary picketing;

29 U.S.C. § 158(b)(4)(B).

The Regional Director's argument that picketing at Chipman constitutes an unfair labor practice is premised upon the following syllogism:

(1) NLRA § 8(b)(4)(B) makes picketing or strikes by a "labor organization" that have certain harmful effects illegal, except those categorized as "primary";

---

**1.** The *Danielson* decision, 494 F.2d at 1240 n. 15, contrasts its standard of review under NLRA § 10(*l*) with the supposedly more deferential "insubstantial and frivolous" standard which the Ninth Circuit adopted in *San Francisco-Oakland Newspaper Guild v. Kennedy.* It is important to note, however, that the Ninth Circuit standard as stated in this opinion also contains the element of "appropriateness" of injunctive relief. 412 F.2d at 544.

For a court to determine whether injunctive relief is "appropriate," it generally must look, *inter alia,* to the likelihood of success on the merits. This general equitable inquiry is con-

sistent with the language of § 10(*l*) which instructs district courts to issue preliminary injunctions when it deems them "just and proper."

There need not, therefore, be a significant gap between the Ninth Circuit's standard of deference to the regional director's "reasonable cause" determination and the Second Circuit's standard which enables the district court to look to the merits enough to determine if the legal basis for the petition is adequate. The *Kennedy* standard requiring the regional director to make a *prima facie* showing of an unfair labor practice, 443 F.2d at 630, is consistent with this type of inquiry.

(2) "primary" picketing must be carried out by individuals who are "employees" as defined by NLRA § 2(3);

(3) therefore, labor organization picketing by non-employees is not protected by the NLRA if it establishes the types of harmful effects proscribed by § 8(b)(4)(B).

Two legal conclusions, which turn upon the specific facts of this case, are essential for the Regional Director's use of this legal framework interpreting NLRA § 8(b)(4)(B). First, the petition argues that the pre-picketing contractual relationship between the owner-operator truckers and Chipman establishes that the former are "independent contractors" rather than "employees." Second, according to petitioner, the involvement of the Teamsters in the picketing of Chipman and Sea-Land means that a "labor organization" is engaged in picketing for purposes of NLRA jurisdiction. Given these two findings, the above syllogism suggests that the picketing in this case constitutes an unfair labor practice under the NLRA, assuming the respondent's picketing establishes effects of the type prohibited by § 8(b)(4)(B).

■■■ Although much of the space in the parties' papers and argument focused on the issue of whether the picketers are "employees" or "independent contractors" under the NLRA, reasonable cause exists for the Regional Director's conclusion that the truckers should be classified as "independent contractors" rather than "employees."[2] Likewise, this Court need not question the petitioner's assumption that the picketing in this case, which is supported

by the Teamsters, is conducted by a "labor organization" for purposes of the NLRA.

### "Primary" Versus "Secondary" Picketing Under the NLRA

■■■ The Regional Director bases his interpretation of § 8(b)(4)(B) of the Act upon a presumption that union picketing constitutes an unfair labor practice *unless* manifestly within the category of conduct made legal as a "primary" labor dispute. This interpretation of the Act looks to the literal language of § 8(b)(4)(B) which describes, at length, conduct by labor organizations that is illegal, while carving out as legal the seemingly limited class of conduct designated as "primary."

There can be little doubt that the literal language of § 8(b)(4)(B) does, in fact, encompass the activity of the Teamsters in this case. The Teamsters maintain that the object of their picketing is not to force any person to cease doing business with any other person, as specified by the Act's prohibition, but rather, "... the sole object of the drivers was to renew their working relationship with Chipman." Resp. Memo. in Opp. to Inj., p. 11. This argument is somewhat disingenuous since the obvious purpose of picketing of this type—whether legal or not—is to put pressure on the picketed party by inducing others to show concern for the picketers by acting in a manner that adversely affects the picketed business, typically by refusal to cross picket lines. Regardless of the Teamsters' intent in picketing Chipman, however, the facts as presented in declarations to the Court show that the effect of the picketing

---

**2.** The petitioner and respondent agree that the proper test of whether a worker is an "independent contractor" or an "employee" is governed by a test that looks to whether the worker has the "right to control" his work. *Merchants Home Delivery Service, Inc. v. National Labor Relations Board,* 580 F.2d 966, 973 (9th Cir. 1978). The parties disagreed strongly, however, as to the outcome of this test in the context of this case.

The Court's attention was thus drawn to such factors as the truckers' ownership of their equipment, their payment by Chipman on a fixed price per haul basis, their payment of their own taxes and fees, the disputed existence of a

fixed starting time to receive shipments from Chipman, the taking of orders from a Chipman dispatcher, and the issuance of U.S. Customs cards for the drivers that list them as "employees." When viewed in their entirety, the Court believes the Regional Director had a reasonable basis to conclude that the owner-operators were "independent contractors" under the relevant test. Although this conclusion is a matter of law, it is heavily dependent upon facts which petitioner is well suited to judge. On matters of statutory interpretation, however, the Regional Director's expertise is less relevant and deserves less deference.

has been to induce certain individuals and businesses to limit their business relationships with Chipman.

The relevant issue then becomes whether the Teamsters' activity falls within the class of conduct protected as "primary." In *National Woodwork Manufacturers Association v. National Labor Relations Board*, 386 U.S. 612, 87 S.Ct. 1250, 18 L.Ed.2d 357 (1967), the Supreme Court conducted a detailed review of the origins of § 8(b)(4) and the intent of those who enacted this provision. The Court cites Senator Taft's statement as to the purposes of Taft-Hartley Act § 8(b)(4)(A), which, after amendment in 1959, became § 8(b)(4)(B):

> "This provision makes it unlawful to resort to a *secondary boycott to injure the business of a third person who is wholly unconcerned in the disagreement between an employer and his employees.* * * * [U]nder the provisions of the Norris-LaGuardia Act, it became impossible to stop a secondary boycott or any other kind of strike, no matter how unlawful it may have been at common law. *All this provision does is to reverse the effect of the law as to secondary boycotts."*

*Id.* at 624, 87 S.Ct. at 1257 (citing 93 Cong. Rec. 4198) (emphasis in original). The Court concluded from this review of the Act's legislative history that the "central theme" pervading § 8(b)(4) is a desire to protect the "neutral" employer from "union pressures designed to involve him in disputes not his own." *Id.* at 625–26, 87 S.Ct. at 1258.

The policy of protecting "neutral" parties from being unfairly drawn into labor disputes has consistently been cited by the Supreme Court as the purpose of § 8(b)(4)'s prohibitions on so-called "secondary" picketing or strikes. *See National Labor Relations Board v. Denver Building & Construction Trades*, 341 U.S. 675, 691–92, 71 S.Ct. 943, 952–53, 95 L.Ed. 1284 (1951); *Local 1976, United Brotherhood of Carpenters and Joiners of America v. National Labor Relations Board*, 357 U.S. 93, 100, 78 S.Ct. 1011, 1016, 2 L.Ed.2d 1186 (1958); *Brotherhood of Railroad Trainmen v. Jacksonville Terminal Co.*, 394 U.S. 369, 388, 89 S.Ct. 1109, 1121, 22 L.Ed.2d 344 (1969); *International Longshoremen's Association v. Allied International, Inc.*, 456 U.S. 212, 223–24, 102 S.Ct. 1656, 1663, 72 L.Ed.2d 21 (1982).

In light of this unambiguous judicial interpretation of § 8(b)(4) and its purpose by the Supreme Court, it is significant that the Regional Director's petition selectively overlooks § 8(b)(4)(B)'s underlying purpose of protecting neutral parties. While the petitioner's argument that picketing at Sea-Land is unlawful refers to the policy against involving neutral employers in labor disputes, the argument pertaining to Chipman is silent as to this critical element of § 8(b)(4) analysis.

*"Primary" Activity and the Definition of "Employee"*

The Regional Director argues that the Teamsters' picketing does not fit the exemption for "traditional, primary labor dispute activity," and therefore must be deemed illegal "secondary" activity. Memo. in Supp. of Petition for Inj., p. 10. The petitioner's argument here revolves around the determination that since the picketing workers in this case are "independent contractors," they are not "employees" under § 2(3) of the NLRA.[3] Accord-

---

3. Section 2(3) of the NLRA provides:

(3) The term "employee" shall include any employee, and shall not be limited to the employees of a particular employer, unless this subchapter explicitly states otherwise, and shall include any individual whose work has ceased as a consequence of, or in connection with, any current labor dispute or because of any unfair labor practice, and who has not obtained any other regular and substantially equivalent employment, but shall not include any individual employed as an agricultural laborer, or in the domestic service of any family or person at home, or any individual employed by his parent or spouse, *or any individual having the status of an independent contractor,* or any individual employed as a supervisor, or any individual employed by an employer subject to the Railway Labor Act, as amended from time to time, or by any other person or is not an employer as herein defined.

29 U.S.C. § 152(3) (emphasis added).

ing to petitioner, it is necessary that a "primary" strike or picketing involve the traditional employer-employee relationship. Thus, the Regional Director argues that those who are not "employees" but who conduct picketing of the type proscribed by § 8(b)(4)(B) necessarily are engaged in an unfair labor practice.

This attempt to limit "primary" activity to statutorily-defined "employees" has no apparent basis in either the construction of the NLRA or judicial interpretation. Section 8(b)(4)(B) makes no mention of *whose* picketing is prohibited or permissible, other than the initial specification that it must be done by a "labor organization or its agents." In contrast, numerous other sections of the NLRA specifically mention either permissible or impermissible conduct by "employees." *See, e.g.* NLRA § 7, 29 U.S.C. § 157 (right of employees to self-organization); NLRA § 8(a)(5), 29 U.S.C. § 158(a)(5) (unfair labor practice for employer to refuse to bargain collectively with representatives of employees).

The fact that the NLRA is primarily concerned with employer-employee relationships and that § 2(3) provides a definition of "employee" does not mean this definition should be read into every section of the Act, regardless of whether a given section makes reference to conduct by "employees." In *National Maritime Union of America, AFL–CIO v. National Labor Relations Board,* 346 F.2d 411 (D.C.Cir.1965), *cert. denied,* 382 U.S. 840, 86 S.Ct. 90, 15 L.Ed.2d 82 (1965), the D.C. Circuit faced this same problem of how to construe the NLRA in light of a definition that does not appear within § 8(b)(4)(B). The court rejected the NLRB's attempt to avoid jurisdiction of the complaint in that case where the Board had argued that a "labor dispute" as defined in § 2 of the Act did not exist:

> ... Section 2 is the "Definitions" section of the Act, reflecting a salutary technique of modern legislative draftsmanship whereby words and phrases used elsewhere in the statute in substantive contexts are given precise definition.

Section 2 does not purport to define the Board's jurisdiction; and the term "labor dispute," which is defined in paragraph (9), does not appear at all in the part of the statute with which we are presently concerned, that is to say Section 8(b)(4)(i) and (ii)(B). There are, of course, other sections of the Act in which "labor dispute" is an operative term, but nowhere in the Act is there an overriding declaration that none of its provisions apply unless there is a "labor dispute" as defined in Section 2(9).

*National Maritime Union,* 346 F.2d at 414–15.

■ The logic of the court's argument applies equally well in this case: the Regional Director should not attempt to read into § 8(b)(4)(B) the requirement that picketing workers represented by a labor organization must be "employees" where this definition is not an operative term in this section of the Act. Moreover, the fact that § 2(3) provides a definition of employees that excludes independent contractors does not mean that Congress intended to write the latter out of the Act entirely. Indeed, it is unlikely that Congress contemplated the existence of cases of this type where union-sponsored picketing was conducted on behalf of independent contractors rather than employees. To the extent that Congress did not speak to such conflicts directly, the proper means of analysis is undoubtedly to look to the underlying purpose of § 8(b)(4)(B).

Consistent with the notion that Congress' purpose in enacting § 8(b)(4)(B) was to protect "neutral" parties, the Supreme Court has described two objectives associated with this section: " ... preserving the right of labor organizations to bring pressure to bear on offending employers in primary labor disputes and of shielding unoffending employers and others from pressures in controversies not their own." *NLRB v. Denver Building & Construction Trades Council,* 341 U.S. at 692, 71 S.Ct. at 953.

Given the purpose of "shielding unoffending employers" associated with the secondary boycott prohibitions, the argu-

ment that picketing by "independent contractors" is secondary activity simply because it lies outside the traditional employer-employee relationship is without merit. In the case of the Teamsters' picketing of Chipman, the picketers stand in relation to Chipman in very much the same way as disgruntled employees who picket their former employer. Chipman's connection to the picketing workers is clearly not as an "unoffending employer." It was because of Chipman's actions, whether justified or not, that the picketing in this case started.

The Regional Director argues that he has reasonable cause to believe that picketing by independent contractors does not constitute "primary" activity, as a matter of law, by virtue of the NLRB's recent decision in *Production Workers Union of Chicago and Vicinity, Local 707, et al. and Checker Taxi Company*, 273 NLRB No. 148 (1984), 1984–85 NLRB Dec. (CCH) ¶ 17,139 (hereinafter *Checker Taxi*). The Board held in this case that "leased cab drivers" who picketed the Checker Taxi Company and the Yellow Cab Company had engaged in an unfair labor practice under § 8(b)(4)(B) since the union picketing on behalf of these independent contractors did not constitute "primary" activity protected by this section. The Board refused to characterize the union's picketing as falling within the "primary" proviso due to the supposedly limited breadth of this exception to the "broad" protection against coercive labor organization picketing. *Checker Taxi*, 1984–85 NLRB Dec. at 29,507. Despite the Teamsters' attempt to distinguish their picketing of Chipman from the Board's *Checker Taxi* decision, the two cases are quite analogous in terms of presenting the issue of how to interpret § 8(b)(4)(B in the context of union picketing concerning independent contractors' grievances.

The *Checker Taxi* decision by the Board has not yet survived judicial scrutiny. Indeed, it appears that no federal court has ruled yet on the question of whether union picketing for independent contractors constitutes an unfair labor practice under NLRA § 8(b)(4)(B). Consequently, al-though the Regional Director's adherence to the NLRB's earlier opinion for purposes of this case is understandable, this Court need not defer to this NLRB precedent which is untested by judicial review and which is so plainly antithetical to the purposes of § 8(b)(4)(B).

*The Presumption in Favor of Peaceful Picketing*

■ The underlying defect of the Regional Director's analysis, like that of the NLRB in *Checker Taxi*, is its improper balance of presumptions in examining the legality of picketing with coercive effects. The petitioner adopts the presumption that all such labor organization picketing is unlawful unless proven to be in the narrow category of "primary" activity. In the case of picketing by the Teamsters on behalf of independent contractors, this presumption is invoked in arguing that such picketing does not accord with the known category of "primary" picketing by employees in a "traditional" labor dispute; hence, such picketing is presumed to be illegal. Nevertheless, this presumption in favor of finding picketing unlawful is inconsistent with Congressional intent in enacting the NLRA and the manner in which the Act has been interpreted by the courts.

In *National Labor Relations Board v. Fruit and Vegetable Packers and Warehousemen, Local 760*, 377 U.S. 58, 84 S.Ct. 1063, 12 L.Ed.2d 129 (1964), the Supreme Court described the presumption in favor of peaceful picketing that underlies the nation's laws concerning labor relations:

Throughout the history of federal regulation of labor relations, Congress has consistently refused to prohibit peaceful picketing except where it is used as a means to achieve specific ends which experience has shown are undesirable. ... We have recognized this congressional practice and have not ascribed to Congress a purpose to outlaw peaceful picketing unless "there is the clearest indication in the legislative history," ... that Congress intended to do so as regards the particular ends of the picketing un-

der review. Both the congressional policy and our adherence to this principle of interpretation reflect concern that a broad ban against peaceful picketing might collide with the guarantees of the First Amendment.

*Id.* at 62–63, 84 S.Ct. at 1066 (footnotes omitted). The Court's discussion of this presumption in favor of picketing was applied in its interpretation of § 8(b)(4) in which it found this section's prohibition of secondary boycotts has a "narrow focus." *Id.* at 63, 84 S.Ct. at 1066.

The NLRB's position in *Checker Taxi,* relied upon so heavily by the Regional Director in this case, is distinctly at odds with this presumption in favor of lawful picketing. The Board provides no convincing support for its assertion in *Checker Taxi* that, " . . . the actual language of Section 8(b)(4) is intentionally broad and our application of that section need not be limited by that term ["secondary boycotts"] when, as here, a union's conduct fits within the actual language of the statute." 1984–85 NLRB Dec. at 29,506. The Board's reliance on *International Longshoremen's Ass'n v. Allied Int'l, Inc.* for the proposition that § 8(b)(4) establishes a broad ban on illegal boycotts is misplaced. Instead, this case found a clear instance where a neutral employer was being harmed by a union boycott and held that such boycotts need not be limited in their goals to establishing economic gains to workers; rather, an impermissible secondary boycott may also arise when unions seek to advance political goals at the expense of neutrals. To the extent that the Court spoke of § 8(b)(4) being drafted "broadly," it was in the context of thereby allowing for adequate protection of "neutral parties, 'the helpless victims of quarrels that do not concern them at all.'" 456 U.S. at 225, 102 S.Ct. at 1664 (quoting legislative history). Once again, therefore, the proper analysis of this section turns on the issue of whether neutral parties are being adversely affected by union picketing.

■ If the Regional Director were reading NLRA § 8(b)(4)(B) in isolation, unassisted by its legislative history or over thirty years of judicial experience in interpreting this section, his interpretation would doubtless be reasonable. Once these interpretive aids enter the picture, however, the validity of the petitioner's legal position that the Teamsters' picketing at Chipman constitutes illegal secondary activity becomes extremely doubtful. Although, as indicated above, it is not this Court's function to attempt to decide this case on its merits, the picketing at Chipman described in this case does not appear to be of the type that § 8(b)(4)(B) was intended to prohibit since it does not have the effect of harming a "neutral" employer. Consequently, the Court is "convinced" that petitioner's request for a preliminary injunction to halt picketing at the Chipman facilities is inconsistent with a proper interpretation of NLRA § 8(b)(4)(B).

### Picketing at Sea-Land

■ Much of the petitioner's argument against the Teamsters' picketing at any gate at Sea-Land is based upon his initial premise that picketing by the union at Chipman constitutes an unfair labor practice. *A fortiori,* picketing at the site of a "neutral" party such as Sea-Land would be a violation of the NLRA. Assuming, however, that the picketing at Chipman is valid, as indicated above, the issue becomes whether ambulatory picketing by the Teamsters at Sea-Land when Chipman trucks are there is a violation of § 8(b)(4)(B).

The petitioner and respondent do not dispute that in such situations, picketing of the primary employer at an ambulatory situs may lawfully occur if certain restrictions are followed. In *Local 761, International Union of Electrical, Radio and Machine Workers, AFL–CIO v. National Labor Relations Board (General Electric Company),* 366 U.S. 667, 81 S.Ct. 1285, 67 L.Ed.2d 592 (1961), the Supreme Court approved the use of separate gates by an employer to distinguish lawful primary activity from an unlawful secondary boycott. The lawful primary activity was that aimed

at the "normal operations of the struck employer." *Id.* at 680, 81 S.Ct. at 1293. In *United Steelworkers of America, AFL–CIO v. National Labor Relations Board,* 376 U.S. 492, 84 S.Ct. 899, 11 L.Ed.2d 863 (1964), the Court sustained picketing away from the premises of the primary employer but which was directed at the primary employer's day-to-day operations at a neutral location. *Id.* at 499–500, 84 S.Ct. at 904.

These well-established precedents confirm that once Sea-Land had established a "reserve" gate for Chipman drivers, it was lawful for the Teamsters to picket this gate when the drivers were at Sea-Land, provided that their pickets indicated that their dispute was with Chipman, the primary employer, and not with Sea-Land. *See generally Sailors' Union of the Pacific (Moore Dry Dock),* 92 N.L.R.B. 547 (1950) (stating standards for valid primary activity at common situs).

Recognizing that this picketing of a reserve gate by the Teamsters may well be legal, the petitioner argues that the union acted unlawfully in the instances where it moved its pickets to the main gate of Sea-Land. The evidence offered by the union, however, suggests that these movements by the pickets may have been made in response to the use of the main gate by Chipman trucks, thereby negating the intended distinction between the main and reserve gates. *See, e.g.,* Decl. of Terry Frame, Aug. 20, 1985, pp. 3–4.

The union acknowledges that it must confine its picketing of neutrals such as Sea-Land to a reserve gate where one is properly established. Resp. Memo. in Opp. to Inj., p. 14 ("The facts show that the Union was very much aware of the requirement that its picketing be restricted to the Chipman gate, except when Chipman trucks used the main gate, and that the Union took pains to adhere to the strict requirements of the law in this respect."). In order to deter future occurrences in which Sea-Land, a neutral employer, is subjected to improper picketing beyond the reserve gate, the Court issues a preliminary injunction for this limited purpose.

The union shall not conduct picketing at any gate other than one designated for Chipman trucks, provided that Sea-Land ensures that Chipman trucks are limited to this reserve gate.

### CONCLUSION

The Court finds that reasonable cause does not exist to conclude that the picketing by the Teamsters of Chipman is in violation of NLRA § 8(b)(4)(B). The Regional Director's petition seeking a preliminary injunction against respondent's picketing at Chipman is therefore DENIED. An injunction limiting Teamsters Local 70 to picketing at a properly-established reserve gate at Sea-Land is hereby GRANTED.

IT IS SO ORDERED.