**PRODUCTION WORKERS UNION OF CHICAGO AND VICINITY, LOCAL 707, et al., Petitioners,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent,**

**Checker Taxi Company, Inc. and Yellow Cab Company, Inc., Intervenors.**

**No. 85–1078.**

United States Court of Appeals, District of Columbia Circuit.

Argued March 18, 1986.

Decided June 13, 1986.

---

Michael M. Conway, with whom Michael Schneiderman, Antony S. Burt, and Jeremiah Marsh, Chicago, Ill., were on brief, for petitioners.

Peter Winkler, Atty., N.L.R.B., with whom Elliott Moore, Deputy Associate Gen. Counsel, N.L.R.B., Washington, D.C., was on brief, for respondent.

Robert E. Haythorne, Geneva, Ill., for intervenors.

Before GINSBURG, SCALIA and BUCK-LEY, Circuit Judges.

Opinion for the Court filed by Circuit Judge GINSBURG.

GINSBURG, Circuit Judge:

This case calls upon us to decide whether Section 8(b)(4) of the National Labor Relations Act (NLRA or Act), 29 U.S.C. § 158(b)(4)—which for decades has been dubbed the "secondary boycott provision" in scores of judicial opinions, administrative decisions, law review articles, treatises, casebooks, and law school classrooms—prohibits union involvement in all picketing by or on behalf of independent contractors, even picketing that is not secondary because not directed against a neutral third party. The Production Workers Union of Chicago and Vicinity, Local 707 (Union) seeks review of a National Labor Relations Board (NLRB or Board) order concluding that the Union violated Section 8(b)(4) by helping certain independent contractors picket their general contractor for better contractual terms.

Without considering whether the general contractor was a neutral third party, the Board held that Section 8(b)(4) proscribes

labor organization participation in all picketing by independent contractors. We hold that in so ruling, the Board has attempted to enlarge the office of Section 8(b)(4) without statutory authority or caselaw support. It was the express intent of Congress, as authoritative precedent observes and affirms, to confine the "secondary boycott provision" to the protection of "unoffending [entities] from pressures and controversies not their own." *NLRB v. Denver Building & Construction Trades Council,* 341 U.S. 675, 692, 71 S.Ct. 943, 953, 95 L.Ed. 1284 (1951).

## I. BACKGROUND

Intervenors Checker Taxi Company (Checker) and Yellow Taxi Company (Yellow) are the principal cab companies operating in Chicago, Illinois; together, they own approximately 80% of all the cabs licensed to operate in that city. Before 1975, these companies employed commissioned drivers, who were statutory employees under the Act and were collectively represented by Local 777 of the Seafarers International Union. In 1975, however, Checker and Yellow began to replace these commissioned drivers with drivers who lease cabs from the cab companies. This court held that these leased cab drivers (LCDs) are not statutory employees and that the cab companies are therefore under no legal obligation to bargain with them. *See Local 777, Seafarers International Union v. NLRB,* 603 F.2d 862 (D.C.Cir. 1978). Today, Yellow and Checker use an overwhelming majority of LCDs rather than commissioned drivers.

After our *Seafarers* opinion, LCDs became dissatisfied with what they regarded as increasingly onerous lease terms. Eventually, they began to organize in hopes that the cab companies would voluntarily agree to deal collectively with them. By early July 1980, the leader of the drivers seeking better lease terms, Reverend Joseph Jerry McAfee, had enlisted about 1200 fellow LCDs. He then consulted with the Union to gain the benefit of its expertise in labor organization and collective representation; by early August, the Leased Taxicab Division of Local 707 of the Production Workers Union had been created. On August 7, the LCDs dissatisfied with the terms of their leases met and decided to attempt negotiations with the cab companies; they further determined, if the companies refused to negotiate, to stop work and picket. On August 8, the Union wrote to Yellow and Checker requesting the companies to recognize and deal with the Division. The cab companies refused and have consistently maintained that they will never recognize the Division.

On August 12, the LCDs and some Union officials began to picket garages of the cab companies. Yellow and Checker maintain two types of garages: one type houses only cabs driven by LCDs; the other houses cabs driven by commissioned drivers. Except for one brief incident, the LCDs confined their picketing to the garages that housed only vehicles operated by LCDs. The exceptional incident occurred at the very beginning of the picketing, early on the morning of August 12, when the LCDs began to picket Yellow Cab's South Indiana Avenue garage. An official of the Seafarers Union soon arrived and explained that only commissioned drivers worked at that garage. Once informed that the garage was for commissioned drivers, the LCDs left immediately. The whole incident lasted less than thirty minutes.

In September, Yellow and Checker filed unfair labor practice charges against the Union under Section 8(b)(4).[1] The NLRB

---

**1.** The cab companies brought several actions in other tribunals at about the same time. First, they sued in Illinois state court, alleging that the Union's picketing violated the Illinois Antitrust Act and Illinois tort law. The trial court denied the companies' motion for a preliminary injunction, and the appellate court affirmed. *See Yellow Cab Company v. Production Workers Union* *of Chicago and Vicinity, Local 707,* 92 Ill.App.3d 355, 48 Ill.Dec. 153, 416 N.E.2d 48 (Ill.App.Ct. 1980). Second, the companies sued in federal district court, again seeking a preliminary injunction, this time under Section 10(1) of the Act, 29 U.S.C. § 160(1), alleging, as they do here, that the picketing violated Section 8(b)(4). The district court denied the preliminary injunc-

Administrative Law Judge (ALJ) assigned to the case conducted a hearing, and on March 9, 1981, he issued a decision and order dismissing the complaint. The ALJ held that the LCDs' picketing fell entirely outside the ambit of the Act because it involved no employer-employee relationship or a labor union acting *qua* labor union (as opposed to acting *qua* advisor to the LCDs); hence the cab companies' charges failed to present a labor dispute falling within the NLRB's subject-matter jurisdiction. *See Production Workers Union of Chicago and Vicinity, Local 707*, Case Nos. 13–CC–1159 and 13–CC–1160 (Mar. 9, 1981), Joint Appendix (J.A.) at 18, 28–31 (*ALJ Opinion*).

On December 18, 1984—after a delay of over three and one-half years—a three-member panel, to whom the NLRB had delegated the decision, rejected the ALJ's view of the case. The panel's opinion first concludes that the unfair labor practice complaint does fall within the NLRA's domain because it was brought against a statutory labor organization. Passing to the merits, the opinion initially acknowledges that the standard case Section 8(b)(4) addresses, as illustrated in the legislative history, is one "in which the union's activity is directed toward a neutral employer in order to pressure another employer whose employees the union seeks to represent or benefit." The matter at hand, the opinion concedes, "is clearly not" such a case.

But Section 8(b)(4) is an intentionally broad provision, the opinion continues; and although the term "secondary boycott" is "generally used as a shorthand reference to the conduct forbidden by" the section, such a broadly drafted provision should not be limited by a term that nowhere actually occurs in the statute. Instead, interpretation should be guided by the purposes animating the provision. Since the LCDs are not statutory employees, the opinion main-

tains, their picketing does not advance one of the section's primary purposes: promoting the right of labor organizations to bring pressure to bear on offending employers in labor disputes. The panel therefore demanded "strong indication" that Section 8(b)(4)'s express permission of "primary picketing" includes picketing in aid of independent contractors. The opinion concludes, on the contrary, that "no [such] implication [exists] in either the legislative history or case precedent." Based on this conclusion, the panel ordered the Union to cease and desist from picketing and to post notices of the Board's decision. *See Production Workers Union of Chicago and Vicinity, Local 707*, 723 N.L.R.B. No. 148 at 5–11 (Dec. 14, 1984) (*Production Workers*).

## II. JURISDICTION

◼ The Union argues, and the ALJ agreed, that the NLRB lacks adjudicatory authority in this case because it involves no statutory employees and therefore entails no labor dispute within the ambit of Section 2(9) of the Act, 29 U.S.C. § 152(9). *See Final Brief of the Production Workers Union, et al.*, at 28–30; *ALJ Opinion*, J.A. at 28–32. The law of this circuit is clear, however, that Section 2(9) does not circumscribe the Board's jurisdiction; rather, it merely defines the term "labor dispute" as it appears elsewhere in the statute. The Board's task was not "to pause at the threshold to identify a conventional labor dispute"; it was instead, "to measure the union's conduct against specific provisions of the Act defining unfair labor practices." *Soft Drink Workers Union Local 812 v. NLRB*, 657 F.2d 1252, 1258 (D.C.Cir.1980). We therefore uphold the Board's ruling that it had jurisdiction to consider whether the Union's picketing violated Section 8(b)(4).

tion motion, reasoning that the LCDs "are tantamount to being employees of" Yellow and Checker, thus their picketing was "for a primary object." *See Crawford v. Production Workers Union of Chicago and Vicinity, Local 707*, No. 80 C–4819, slip op. at 5 (N.D.Ill. Dec. 11, 1980).

Finally, the cab companies commenced an action against the Union for damages under Section 303 of the Act, 29 U.S.C. § 187. That case is still pending. *Checker Taxi Co. v. National Production Workers Union*, No. 80 C–6573 (N.D. Ill.).

## III. THE MERITS

We reject, however, the central premise of the NLRB's order. The Board erroneously concluded that Section 8(b)(4) prohibits union involvement in all picketing by or on behalf of independent contractors. Rather, that section prohibits only "secondary activity": union attempts to involve neutral third parties in disputes not their own. *See, e.g., National Woodwork Manufacturers Association v. NLRB (National Woodwork)*, 386 U.S. 612, 624–26, 87 S.Ct. 1250, 1257–58, 18 L.Ed.2d 357 (1967); *United Scenic Artists, Local 829 v. NLRB*, 762 F.2d 1027, 1032–33 (D.C.Cir.1985). The provision would therefore bar the Union-aided picketing at issue only if the picketing were directed against a neutral third party in this dispute.[2]

### A. *The Board's Opinion*

Section 8(b)(4), stripped to its relevant essentials, provides that it shall be an unfair labor practice for a union (i) to induce an employee to refuse to work or (ii) to threaten, coerce or restrain any person, if an object of the behavior described in (i) or (ii) is "(B) forcing or requiring any person to cease doing business with any other person ... Provided that nothing in this clause (B) shall be construed to make unlawful, where not otherwise unlawful, any primary strike or primary picketing." The NLRB concluded in the present case that the Union's picketing of the LCD garages was an attempt to coerce the other LCDs

to cease doing business with Yellow and Checker and so was a violation of Section 8(b)(4)(ii)(B). The Board also concluded the Union's picketing of the South Indiana garage, which housed only vehicles operated by commissioned drivers, was an attempt to induce those employees to stop work, with the object to require them to cease doing business with the cab companies in violation of Section 8(b)(4)(ii)(B). *See Production Workers* at 10.

We need not tarry over the Board's determination that the picketing was an attempt to cause the LCDs and the commissioned drivers to stop doing business with Yellow and Checker;[3] even so characterized, the picketing was "primary" under the Section 8(b)(4) proviso that nothing in the section makes primary picketing unlawful. We vacate and remand the Board's order on that account.

The Board's opinion recognizes that the proviso makes only secondary activity unlawful. *Id.* at 9. It also acknowledges that Section 8(b)(4) is usually dubbed the "secondary boycott provision" and that a secondary boycott is the use of pressure on a neutral, third party in order to gain objectives in a dispute with a different, primary party. Stressing that the term "secondary boycott" appears nowhere in the statutory language, however, the Board maintains that the provision may reach behavior that is not technically a secondary boycott—although presumably the proscribed behavior

---

**2.** In a recent case with almost identical underlying facts, the Regional Director of the NLRB petitioned the Northern District of California for a preliminary injunction against picketing by independent contractors. The Regional Director argued, as does the NLRB here, that Section 8(b)(4) bans union participation in all picketing on behalf of independent contractors. In reasoning very similar to that adopted in this opinion, the court denied the petition. *See Scott v. Brotherhood of Teamsters and Auto Truck Drivers, Local No. 70 of Alameda County*, 633 F.Supp. 121 (N.D.Cal.1985). The Ninth Circuit has since issued an unadorned order granting the Regional Director's motion for an injunction pending an expedited appeal, and thereafter, an order with consent of counsel staying the appeal until April 30, 1986, or the issuance of this opinion. *See Scott v. Local No. 70*, No. 85–2753

(9th Cir. Nov. 11, 1985) (order granting injunction pending appeal) and (9th Cir. Feb. 6, 1986) (order staying appeal).

**3.** We note a reservation, however, about the Board's conclusion that the picketing at the South Indiana garage was an attempt to cause the commissioned drivers to stop work. The Board seems to acknowledge, as the ALJ found, that the Union believed that the South Indiana garage housed only LCD-operated vehicles. The Board maintains, however, that the Union should have discovered in advance that the garage housed only cabs operated by commissioned drivers. *See Production Workers* at 10. Because we vacate and remand the Board's order on another ground, we do not address this matter.

must still be secondary activity. *Id.* at 6–7. The Board's opinion does not essay an explanation of this distinction between a "secondary boycott" and the presumably broader category of "secondary activity." [4] It does, however, conclude without elaboration and with reference only to two miscited NLRB opinions, *see infra* at 330, that secondary activity includes all picketing on behalf of independent contractors. *Id.* at 9. The Board-tendered blanket rule would thus ban union involvement in picketing by independent contractors not only against neutral parties but also against parties, such as Yellow and Checker, who are directly and intimately involved in the underlying dispute.

■■■■ Over the years since the adoption of Section 8(b)(4) in 1947, the NLRB has handled a great number of cases delineating the labels "neutral" and "secondary boycott," [5] but the Board has never before suggested, to the court's knowledge, that Section 8(b)(4) prohibits union participation in picketing against a party regardless of that party's involvement in the underlying issue. We recognize that an agency may change its interpretation of a statute entrusted to its administration, and that when the intent of Congress is unclear courts must uphold the agency's interpretation if it is based on a "reasonable accommodation of conflicting policies." *See Chevron, U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 2781–83, 81 L.Ed.2d 694 (1984). When the intent of Congress is clear, however, the court must give effect to the intent of Congress regardless of the agency's opinion. *Id.* at 2781–82. *See Securities Industry Association v. Board of Governors of the Federal Reserve System*, 468 U.S. 137, 104 S.Ct. 2979, 2983–92, 82 L.Ed.2d 107 (1984) (holding agency's interpretation of statute inconsistent with congressional intent).

We find the intent of Congress on this issue, as described by definitive, repeated, and unambiguous Supreme Court precedent, altogether clear: Section 8(b)(4) was designed to prohibit only pressure brought to bear on "a third person who is wholly unconcerned in the disagreement," whether that pressure is called a "secondary boycott" or "secondary activity." 93 Cong. Rec. 4198 (1947) (remarks by Senator Taft on Section 8(b)(4)). Moreover, even if the intent of Congress were less than pellucid, the Board's conclusion that Section 8(b)(4) prohibits all union-aided picketing by independent contractors, we believe, would scarcely qualify as a "reasonable accommodation" of the section's policies.

B. *The Legislative Meaning of "Secondary"*

As originally enacted in 1947 as part of the Taft-Hartley Act, Section 8(b)(4) did not contain the proviso limiting the section's prohibition to non-primary activity. *See* ch. 120, 61 Stat. 140 (1947). The legislative history of the section, however, securely indicates that Congress intended the provision to prohibit only secondary pressure—pressure against neutrals. The Conference

---

**4.** As noted, the Board apparently believes that a secondary boycott is pressure on a neutral third party, but that secondary activity includes some unspecified class of behavior, including all picketing in aid of independent contractors, that may or may not be directed against a neutral party. As we will explain, *see infra* at 328–330, we find this distinction between a "boycott" and "activity" irrelevant because the quality that makes behavior secondary—whether it be labelled a secondary, boycott or secondary activity—is that it is directed against a neutral party. Moreover, we see no basis in the meaning of the words "boycott" and "picketing" that would account for such differential treatment, for picketing is usually just a means to promote a boycott: "A 'boycott' is a refusal to deal, whether by an employer or a customer (or, more rarely, a seller); a 'strike'—a refusal to work—is then a variety of boycott; 'picketing' is ordinarily an attempt, by means of patrolling at a site with a message of some kind on the picket sign, to instigate a boycott on the part of those seeing the picket." Lesnick, *The Gravamen of the Secondary Boycott*, 62 Col.L.Rev. 1363, 1364 n. 5 (1962). Virtually by definition, then, secondary picketing is picketing initiated to prompt a secondary boycott against a neutral party.

**5.** *See generally* R. Dereshinsky, A. Berkowitz, P. Miscimarra, The NLRB and Secondary Boycotts (1981).

Report accompanying the Act specified that the section does not prohibit "the primary strike for recognition." As the Board itself appeared to acknowledge, *see Production Workers* at 6, the report also lists as examples of prohibited conduct only classic secondary boycotts, pressure against a neutral party. H.R.REP. No. 510, 80th Cong., 1st Sess. 43 (1947), *reprinted in* I Legislative History of the Labor Management Relations Act, 1947 at 505–547 (hereinafter cited as LMRA History). Senator Taft's comments on the floor of the Senate are even more explicit. Noting that under the Norris-LaGuardia Act secondary boycotts had been wholly lawful, the senator explained: "All this provision of the bill does is to reverse the effect of the law as to secondary boycotts." 93 Cong.Rec. 4198 (1947).

According to this unequivocal legislative history, then, the quality that makes behavior secondary is that it fits the common law definition of secondary boycotts. The classic definition, often quoted by the Supreme Court in connection with Section 8(b)(4), is by Learned Hand: "The gravamen of a secondary boycott is that its sanctions bear, not upon the employer who alone is a party to the dispute, but upon some third party who has no concern in it." *International Brotherhood of Electrical Workers v. NLRB*, 181 F.2d 34, 37 (2d Cir.1950); *see Brotherhood of Railroad Trainmen v. Jacksonville Terminal Co.*, 394 U.S. 369, 388, 89 S.Ct. 1109, 1121, 22 L.Ed.2d 344 (1969); *Local 761, International Union of Electrical, Radio & Machine Workers v. NLRB*, 366 U.S. 667, 672, 81 S.Ct. 1285, 1288–89, 6 L.Ed.2d 592 (1960). Professor Cox has incisively expressed the concept: "Historically, a boycott is a refusal to have dealings with an offending person.... The element of 'secondary activity' is introduced when there is a refusal to have dealings with one who has dealings with the offending person.... Thus, there are two employers in every secondary boycott resulting from a labor dispute." Cox, *The Landrum-Griffin Amendments to the National Labor Relations Act*, 44 MINN.L. REV. 257, 271 (1959). Similarly, the Su-

preme Court has observed that although the concept "secondary boycott" has "chameleon-like qualities," all common-law commentators "agreed upon its central aspect: pressure tactically directed toward a neutral employer in a labor dispute not his own." *National Woodwork*, 386 U.S. at 623, 87 S.Ct. at 1257; *see also* Hellerstein, *Secondary Boycotts in Labor Disputes*, 47 YALE L.J. 341, 364 (1938).

From its earliest constructions of Section 8(b)(4), the Supreme Court has adopted this interpretation. In *NLRB v. Denver Building and Construction Trades Council*, 341 U.S. 675, 71 S.Ct. 943, 95 L.Ed. 1284 (1951), the Court recognized that the original language of the provision would bar virtually all union involvement in picketing, even that specifically protected by other provisions of the Act. The Court therefore looked instead to the purposes of the provision, observing that the section "often is referred to in the Act's legislative history as one of the Act's 'secondary boycott sections,'" and citing Senator Taft's remark, quoted above, that the provision does no more than make secondary boycotts illegal. *Id.* at 686, 71 S.Ct. at 950. Finally, the Court described the policy behind this prohibition as "shielding unoffending employers and others from pressures in controversies not their own." *Id.* at 692, 71 S.Ct. at 953. For the *Denver Building* Court, then, the quality that makes pressure "secondary" was the same as that reflected in the legislative history: it is brought against a third party not involved in the underlying dispute.

In the 1959 Landrum-Griffin Act, the Congress then sitting gave its implicit imprimatur to the Supreme Court's interpretation by inserting the proviso of present Section 8(b)(4) that explicitly protects primary activity. Since that time, as in the years before, the caselaw has universally and unambiguously held that Congress intended Section 8(b)(4) to protect only neutral parties—and not even all neutrals—from coercion in disputes not their own. *See, e.g., NLRB v. Local 825, International Union of Operating Engineers*, 400

U.S. 297, 302–03, 91 S.Ct. 402, 406, 27 L.Ed.2d 398 (1971); *National Woodwork,* 386 U.S. at 623–24, 626–28, 87 S.Ct. at 1257, 1258–59; *Local 1976, United Brotherhood of Carpenters v. NLRB,* 357 U.S. 93, 98, 100, 78 S.Ct. 1011, 1015, 1016, 2 L.Ed.2d 1186 (1958); *United Scenic Artists, Local 829, Brotherhood of Painters and Allied Trades, AFL–CIO v. NLRB,* 762 F.2d 1027, 1033 (D.C.Cir.1985); *Local Union 501, International Brotherhood of Electrical Workers, AFL–CIO v. NLRB,* 756 F.2d 888, 893 (D.C.Cir.1985). The Supreme Court has also repeatedly cited as controlling upon judicial interpretation Senator Taft's remark that Section 8(b)(4) does no more than make secondary boycotts unlawful. *See, e.g., National Woodwork,* 386 U.S. at 624, 87 S.Ct. at 1257; *NLRB v. International Rice Milling Co.,* 381 U.S. 665, 673–74 n. 8, 71 S.Ct. 961, 965–66 n. 8, 95 L.Ed. 1277 (1951); *see also* Levin, *"Wholly Unconcerned": The Scope and Meaning of the Ally Doctrine Under Section 8(b)(4) of the NLRA,* 119 U.Pa.L.Rev. 283, 283 & n. 3 (1970). Moreover, the Court has repeatedly described Congress' purpose in Section 8(b)(4) as protecting "unoffending employers," "the helpless victims of quarrels that do not concern them at all."[6] *See, e.g., Edward J. Debartolo Corp. v. NLRB,* 463 U.S. 147, 103 S.Ct. 2926, 2932, 77 L.Ed.2d 535 (1983); *International Longshoremen's Association, AFL–CIO v. Allied International, Inc.,* 456 U.S. 212, 223 n. 20, 225, 102 S.Ct. 1656, 1663 n. 20, 1664, 72 L.Ed.2d 21 (1982) (*ILA* ); *National Woodwork,* 386 U.S. at 626–27, 87 S.Ct. at 1258–59.

Thus, we find Congress' intent plain and not subject to genuine dispute: secondary activity under Section 8(b)(4)(B) refers only to pressure on a neutral third party. In contrast to the array of authority supporting this construction of the section, the NLRB offers no apposite authority for its conclusion that secondary activity includes all picketing "on behalf of independent contractors." The NLRB panel opinion relies on two categories of cases. First, by way

of background, the panel relies on the Supreme Court's opinion in *ILA,* 456 U.S. at 225, 102 S.Ct. at 1664, for the atmospheric proposition that Section 8(b)(4) is "intentionally broad." *Production Workers* at 5, 7. The cited portion of that opinion, however, explains that the provision's proscription is broad only in that it reaches many forms of secondary boycotts, politically as well as economically motivated ones: "The prohibition was drafted broadly to protect neutral parties, 'the helpless victims of quarrels that do not concern them at all.' [citation omitted].... Recognizing that '[i]llegal boycotts take many forms,' [citation omitted], Congress intended its prohibition to reach broadly." *ILA,* 456 U.S. at 225, 102 S.Ct. at 1664. The *ILA* opinion at no point even intimates that the prohibition is so broad as to reach pressure against non-neutral parties.

Next, the Board panel's opinion inappositely cites two NLRB orders for the proposition that secondary activity includes all picketing on behalf of independent contractors. *See Production Workers* at 9 & n. 23 (*citing Local 814, Teamsters, Chauffeurs, Warehousemen and Helpers of America (Santini Bros.),* 208 N.L.R.B. 184 (1974); *Local 221, Teamsters, Chauffeurs, Warehousemen and Helpers of America,* 222 N.L.R.B. 423 (1976)). These orders, however, involve not picketing on *behalf* of independent contractors but *against* neutral independent contractors. In both, unionized employees of trucking companies attempted to force independent owner-operators—neutral third parties in the dispute between employees and employers—to join the union. The Board correctly held in both cases that such pressure against a neutral violates Section 8(b)(4).

Here on appeal, the NLRB relies principally and inappositely on *NLRB v. Denver Building and Construction Trades Council, supra.* In that case, the Court and the Board found only that a secondary boycott occurred when a union picketed a neutral

---

**6.** This latter phrase originally appeared in the House Report accompanying the Taft-Hartley Act. *See* H.R.Rep. No. 245, 80th Cong., 1st Sess. 23 (1947), *reprinted in* LMRA History at 314.

general contractor in order to cause the general to terminate its contract with the nonunion subcontractor with whom the union's dispute lay. *See id.* at 686–89, 71 S.Ct. at 950–51. Again, the defining feature of "secondary" activity for the Court was that the activity trained pressure against a neutral third party, the general contractor. All of the other cases cited by the Board also fit this pattern. Neither in its brief nor in its order has the NLRB adduced a single case or shred of legislative history supporting the notion that pressure directed against a party who is not neutral can be secondary.[7]

Thus, we harbor no doubt on the critical inquiry in this case: the Board misapprehended Congress' specific intent in concluding that Section 8(b)(4) prohibits union involvement in all picketing by independent contractors. The order under review is therefore invalid. *See Chevron,* 104 S.Ct. at 2781–82 & n. 9.

## C. *Accommodation of Statutory Purposes*

If congressional intent were less clear, so that room remained for agency elucidation, we would nonetheless find the Board's definition of "secondary" erroneous. The Supreme Court has instructed us that, absent specific guidance from Congress, the agency's interpretation of a law it administers need only be "based on a permissible construction," one that reflects a "reasonable accommodation of conflicting policies that were committed to the agency's care by the statute." *Id.* at 2782, 2783. This standard, we have stated, requires a reviewing court to determine whether the "interpretation [advanced by the agency] is arguably consistent with the underlying statutory scheme in a substantive sense" and whether the agency's consideration of the issue is

adequately reasoned. *Rettig v. Pension Benefit Guaranty Corporation,* 744 F.2d 133, 151 (D.C.Cir.1984). Even under this relatively deferential or relaxed standard, we could not accept as rational the Board's interpretation of Section 8(b)(4)'s compass.

The Board's opinion states that to determine what conduct Section 8(b)(4) proscribes, a tribunal should examine "the problem to which the legislation was addressed." The Board panel then sets out the "dual Congressional objectives" underlying Section 8(b)(4): "preserving the right of labor organizations to bring pressure to bear on offending employers in primary labor disputes"; and "shielding unoffending employers and other from pressures in controversies not their own." *Production Workers* at 7 (quoting *Denver Building,* 341 U.S. at 692, 71 S.Ct. at 953). Next, the opinion notes that assisting independent contractors to picket would not help labor organizations apply pressure to offending employers because no employers or employees would be involved. For this reason, the Board panel declared, the "equations are not balanced in [the Union's] favor." *Id.* at 8. Therefore, for the Union to succeed, the Board required some "strong indication" in caselaw or legislative history that Congress intended "primary" activity to include picketing on behalf of independent contractors. The Board then conclusorily announced that it could find no such indication.

As we have seen, the caselaw and legislative history in fact contain extraordinarily "strong indication" that Congress intended "primary activity" to include all picketing against non-neutral parties, whether by independent contractors or by anyone else, and the panel's failure to find this indication is inexplicable. Aside from this blindspot, moreover, the Board's view that the

---

**7.** Most of the parties' arguments center around whether an independent contractor who has a contract with the party with whom the picketers have a dispute is automatically a neutral. Some precedent in this circuit indicates that such a party is not automatically neutral. *See Carpet, Linoleum, Soft Tile and Resilient Floor Covering Layers, Local Union No. 419 v. NLRB,* 429 F.2d 747 (D.C.Cir.1970). We do not reach that issue, however, because the factual situation before us is different: we have in this case not picketing by employees against a third party related only by contract to the employer of the picketers, but picketing by independent contractors against the very party with whom they have a dispute.

policy "equations" are "balanced" against the Union appears to us both unreasoned and not in line with the precise policies underlying Section 8(b)(4). The Board has entirely ignored the consideration that its order will not advance either of the purposes that it accurately ascribes to the section. The Board panel tells us that assisting independent contractors to picket will not help labor unions to pressure offending employers. But the panel fails to notice as well that forbidding union aid to independent contractors who picket non-neutrals will in no way help to shield neutrals from pressure in controversies not their own. Thus, the Board's whole "balance" metaphor is misplaced, for the "dual Congressional objectives" simply are not in tension in this case.

The Board panel also refers to the general policies of the NLRA, which the Board's opinion describes as promoting "the full flow of commerce," on the one hand, and preserving "the rights of labor to organize," on the other. *Production Workers* at 7. According to the Board, assisting independent contractors to picket would have a "deleterious effect on commerce" but would not help labor to organize because the LCDs are not statutory employees. So, again, the "equations are not balanced in [the Union's] favor." *Id.* at 8.

As the Board itself conceded and we have detailed, however, Congress specified more particular policies for Section 8(b)(4) than simply the background policies of the Act. The Board relies on Section 1 of the Act, 29 U.S.C. § 151 ("Findings and Declaration of Policy"), for its conclusion that Congress sought to promote the flow of commerce. That provision explains that Congress sought to speed the flow of commerce in two specific ways: first by protecting the rights of employees to organize and bargain collectively; and second by prohibiting "certain practices" by unions— *i.e.*, unfair labor practices—that burden commerce. Thus, the Act seeks to aid commerce not by setting up the Board as grand diviner of what will serve that end, but in specific ways through specific provisions with their own specific policies.

This congressional focus on embedding policy in specific provisions is especially keen as regards prohibitions on peaceful picketing, as the Supreme Court has explained: "Throughout the history of federal regulation of labor relations, Congress has consistently refused to prohibit peaceful picketing except where it is used as a means to achieve specific ends which experience has shown are undesirable.... We have recognized this congressional practice and have not ascribed to Congress a purpose to outlaw picketing unless 'there is the clearest indication in the legislative history,' [citation omitted], that Congress intended to do so as regards the particular ends of the picketing under review." *NLRB v. Fruit & Vegetable Packers & Warehousemen, Local 760*, 377 U.S. 58, 62–63, 84 S.Ct. 1063, 1066, 12 L.Ed.2d 129 (1962); *see NLRB v. Drivers, Chauffeurs, Helpers, Local Union No. 639*, 362 U.S. 274, 284, 80 S.Ct. 706, 712, 4 L.Ed.2d 710 (1960).

As we have already explained, the Board has drawn our attention to no indication in the legislative history of Section 8(b)(4), much less the "clearest indication," that Congress' specific policy regarding secondary activity encompassed prohibition of union involvement in all picketing by independent contractors. Instead, the Board's flawed analysis yielded the contrary and insensible demand that the Union produce "strong indication" that Congress' policy would not abide blanket exclusion of unions from all engagement in picketing by independent contractors. The Board's position, we conclude, does not withstand the test of reasoned decisionmaking.

### IV. CONCLUSION

■ We hold that the NLRB applied the wrong standard to determine whether the Union's picketing violated Section 8(b)(4), the secondary boycott provision of the NLRA. We therefore remand this case to the Board so that it may apply the correct standard: the section does not exclude union involvement in all picketing by indepen-

dent contractors; rather, its proscription is limited to picketing against neutral parties.

 We offer one further clarification to aid the Board in its task. The Board has argued before us that Yellow and Checker are in fact neutrals because a neutral is anyone not involved in a dispute between employers and employees. Under this analysis, the cab companies are neutrals because their dispute with the LCDs is not one between employers and employees. *See* Brief for the NLRB at 13–14 n. 5. This stilted interpretation is not the one Congress intended. Nor is it one the Board conceived at the time it rendered its opinion. Then, the Board recognized "clearly" that the factual situation in this case is not one in which the union's activity is directed toward a neutral. *See Production Workers* at 6. As we have already explained, *see supra* at 11–14, a neutral is a third party "wholly unconcerned" in a dispute between two other parties. Yellow and Checker are not at all neutral in this sense; the LCDs' dispute over contract terms lies precisely and only with the cab companies.

In short, then, "we perceive no basis for the Board's decision" because the Board has not "been able to cite any legal authority to support [its] strained new view on the meaning of" secondary activity under Section 8(b)(4). *Teamsters Local Union No. 175, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America v. NLRB*, 788 F.2d 27, 32 (D.C.Cir.1986) (referring to the Board's recent construction of the term "bargaining impasse" under Section 8(a)(5) of the Act, 29 U.S.C. § 158(a)(5)). Congress and the courts long ago clearly established that Section 8(b)(4) bars only pressure against neutrals, and the Board has adduced no remotely tenable argument for its breathtakingly novel interpretation of the provision.[8]

For the reasons stated, we vacate the Board's order and remand this case to the

NLRB for proceedings consistent with this opinion.

*It is so ordered.*

---

**8.** Our decision does not address, and therefore leaves open, the question whether the union's activity at issue here violates another provision of the Act or is illegal under some other state or federal law. *See supra* 325–326 n. 1 (describing pending proceedings in other fora).