**CHECKER TAXI COMPANY, et al., Plaintiffs,**

v.

**NATIONAL PRODUCTION WORKERS UNION, et al., Defendants.**

**No. 80–C–6573.**

United States District Court, N.D. Illinois, E.D.

May 12, 1986.

Robert E. Haythorne, Geneva, Ill., for plaintiffs.

Jeremiah Marsh, Hopkins & Sutter, Chicago, Ill., for defendants.

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

Checker Taxi Company, Inc. ("Checker") and Yellow Cab Company, Inc. ("Yellow") (collectively "Companies") have sued National Production Workers Union and Production Workers Union of Chicago and Vicinity, Local 707 (collectively "Unions") under the Labor Management Relations Act (the "Act"),[1] 29 U.S.C. §§ 141 to 187, charging Unions conducted a secondary boycott in violation of Act § 158(b)(4). Companies have now moved under Fed.R. Civ.P. ("Rule") 56 for summary judgment. For the reasons stated in this memorandum opinion and order, Companies' motion is granted as to liability but denied as to damages.

### Facts [2]

In 1980 Companies together owned 3,666 of Chicago's 4,600 taxicab franchises (Defendants' Statement of Material Facts ["Def.St."] ¶ 1). Instead of employing their own drivers, Companies for the most part leased their cabs to independent drivers (*id.* ¶ 2). During the summer of 1980 many of the leased cab drivers ("LCDs") became dissatisfied with the terms of their leases (*id.* ¶ 3). They formed the "Leased Taxicab Drivers Division" within Unions (*id.* ¶ 4). On August 8, 1980 Unions sent letters to Companies' presidents, asking

them to meet with Unions to discuss the terms of the leases (*id.* ¶ 5). Companies refused to bargain with Unions (*id.*).

On August 12, 1980 the LCDs and some representatives from Unions began picketing Companies' garages (*id.* ¶ 6). That afternoon a temporary restraining order ("TRO") prohibiting the picketing was issued, and the picketing stopped (*id.* ¶¶ 7, 8). No picketing occurred between August 13 and August 22 while the TRO remained in effect (Stroud Aff. ¶ 3). Thereafter the picketing resumed sporadically (*id.* ¶ 4; Collins Dep. 71).

In September 1980 Companies filed unfair labor practice charges against Unions. On March 9, 1981 Administrative Law Judge Ohlbaum concluded the picketing did not violate the Act (P. Ex. A). On December 14, 1984 (sic!) a three-member panel of the National Labor Relations Board ("Board") decided the picketing violated Act § 158(b)(4) (*id.*).[3] Unions have appealed that decision to the Court of Appeals for the District of Columbia Circuit, which has recently heard oral argument and has the case under advisement (Unions Mem. 2 n.*).

### Contentions of the Parties

Companies argue Board's decision precludes Unions from relitigating in this action the issue of their liability for violating Act § 158(b)(4). Accordingly Companies seek to recover lost profits of $405,389.78[4] under Act § 187:

---

**1.** All further citations to Title 29 will take the form "Act § —," referring to Title 29's numbering rather than the Act's internal numbering.

**2.** Rule 56 principles impose on the party moving for summary judgment the burden of establishing the lack of a genuine issue of material fact (a proposition most recently repeated in *McGraw Edison Co. v. Walt Disney Productions,* 787 F.2d 1163, 1167 (7th Cir.1986)). For that purpose this Court must view the evidence in the light most favorable to the nonmovants—in this case Unions. *Black v. Henry Pratt Co.,* 778 F.2d 1278, 1281 (7th Cir.1986).

**3.** There is no accounting for what seems an unconscionable delay by Board (just three

months short of four years). In the meantime, because of the obvious potential impact of those proceedings on this action, the parties had requested (and this Court had granted) repeated stays of activity here. Even the patient Penelope would have been sorely tried by the extended delays, and this Court finally required the parties to get back on track. After some discovery by both sides, Companies' current motion resulted.

**4.** According to Companies' supporting affidavits (P. Exs. B and C), Checker seeks $197,688.23 and Yellow seeks $207,811.55. Companies offer no explanation for the discrepancy between that total of $405,499.78 and the $110 lower text figure (drawn from Companies Mem. 3).

(a) It shall be unlawful ... for any labor organization to engage in any activity or conduct defined as an unfair labor practice in section 158(b)(4) of this title.

(b) Whoever shall be injured in his business or property by reason or [sic—should be "of"] any violation of subsection (a) of this action may sue therefor in any district court of the United States ... and shall recover the damages by him sustained and the cost of the suit.

Unions respond to that claim in four ways:

1. Unions have appealed Board's adverse decision. Hence res judicata principles should not bar relitigation of Unions' liability under Act § 158(b)(4).

2. Application of res judicata would be "unfair" to Unions.

3. Companies have not established Unions' picketing was the sole cause of Companies' decreased revenues.

4. Companies failed to mitigate their damages.

### Summary Judgment as to Liability

Companies rest their case on Board's decision that Unions committed an unfair labor practice by engaging in a secondary boycott. That, they say, collaterally estops Unions from relitigating their liability for damages flowing from that unfair labor practice. *Wickham Contracting Co. v. Board of Education of City of New York*, 715 F.2d 21, 26 (2d Cir.1983) puts Companies' case for them:

> We turn first to the collateral estoppel issue. It is now settled that administrative proceedings can have a preclusive effect in the form of either *res judicata* or collateral estoppel. As the Supreme Court has noted:
>
> > When an administrative agency is acting in a judicial capacity and resolved disputed issues of fact properly before it which the parties have had an adequate opportunity to litigate, the courts have not hesitated to apply *res judicata* to enforce repose.
>
> *United States v. Utah Construction Co.*, 384 U.S. 394, 422, 86 S.Ct. 1545, 1560, 16 L.Ed.2d 642 (1966). Following

this general rule, a number of circuits have held that prior N.L.R.B. unfair labor practice determinations can be binding as to fact and law under the doctrine of collateral estoppel in subsequent section 303 damage actions.

\* \* \* \* \* \*

> The legal and factual issues in the administrative and judicial proceedings are, but for damages, absolutely identical since section 303 authorizes damage actions for violations of section 8(b)(4), the very issue of liability adjudicated by the Board. So long as particularized unfairness is not demonstrated, we perceive no reason to allow a union or employer who has lost an 8(b)(4) unfair labor practice proceeding before the Board to relitigate issues relating to liability. Since there is no reason to believe that legal results in section 303 actions will be superior to those arrived at in the administrative proceedings, or that inconsistent results before the different tribunals will increase procedural or substantive fairness, the judicial and other resources consumed in relitigating such issues is pure waste.

See also *Bowen v. United States*, 570 F.2d 1311, 1320–22 (7th Cir.1978).

■ Unions first insist their appeal from Board's adverse ruling deprives it of its preclusive effect, on the theory (Unions Mem. 6) the administrative decision lacks finality until it has "survived judicial scrutiny." That contention is without merit. *Restatement (Second) of Judgments* ("Restatement") § 13 comment f (1980) states the familiar general rule:

> There have been differences of opinion about whether, or in what circumstances, a judgment can be considered final for purposes of res judicata when proceedings have been taken to reverse or modify it by appeal. The better view is that a judgment otherwise final remains so despite the taking of an appeal unless what is called an appeal actually consists of a trial de novo; finality is not affected by the fact that the taking of the appeal

operates automatically as a stay or supersedeas of the judgment appealed from that prevents its execution or enforcement, or by the fact that the appellant has actually obtained a stay or supersedeas pending appeal.

And Restatement § 83(1) and its comment *a* both say that rule applies to administrative determinations as well:

> Except as stated in Subsections (2), (3), and (4), a valid and final adjudicative determination by an administrative tribunal has the same effects under the rules of res judicata, subject to the same exceptions and qualifications, as a judgment of a court.
>
> \* \* \* \* \* \*
>
> An administrative adjudication becomes preclusive when it has become final in accordance with the rules stated in §§ 13 and 14. It is not necessary that the administrative adjudication have been reviewed and affirmed by a court.

Hence Unions' appeal does not alter the preclusive effect of Board's decision.[5]

■ As earlier indicated, Unions next argue application of issue preclusion principles would be "unfair" because:

> 1. "substantial doubt" exists as to the correctness of Board's decision; and
>
> 2. a judgment against Unions would have "dramatic consequences" for their existence.

Neither of those arguments can succeed either.

■ Unions first urge both a state court (D. Ex. B) and a federal court (D. Ex. C) refused to grant a preliminary injunction prohibiting the picketing. They also point to a district court decision (*Scott v. Brotherhood of Teamsters and Auto Truck Drivers, Local No. 70*, 633 F.Supp. 121, 129 (N.D.Cal. Oct. 21, 1985))(D. Ex. A) that explicitly criticizes Board's decision. But any claimed "unfairness" due to the doubts those decisions might cast on the rightness of Board's ruling runs head-on into the same issue-preclusion answer. Litigants

have never been able, in a second case, to avoid the res judicata impact of the decision in their first litigation because that decision is arguably wrong—that after all is what appeals are for.

■ Unions' final "unfairness" contention asserts their inability to pay a judgment in the amount requested by Companies. But the relevant legal standard is not that, but rather the one stated in *Bowen*, 570 F.2d 1322–23:

> An additional factor remains to be considered. If, because the significance an administrative determination would have in later court proceedings is not reasonably foreseeable, a party does not choose to litigate the common issues in the administrative proceeding, it would be unfair to hold him bound by the administrative determination. Compare *Restatement (Second) Judgments* § 68.1(e)(ii) and (iii).

■ On that score Act § 187 specifically authorizes a damages action for violations of Act § 158(b)(4). Unions cannot claim Companies' lawsuit was unforeseeable. Unions had every incentive to litigate their position vigorously at the administrative level. They cannot now claim unfair surprise simply because Companies seek a large judgment based on Board's decision.

In summary, Unions cannot avoid the impact of Board's decision as determinative of Unions' liability for violating Act § 158(b)(4). Companies are entitled to summary judgment on that issue.

### Summary Judgment as to Damages

As n. 4 reflects, Checker claims $197,-688.23, and Yellow $207,811.55, in lost profits for the last five months of 1980. To support their claims, Companies rely on affidavits of their respective vice presidents (P. Exs. B and C) reflecting two calculations:

> 1. each company's assertedly-reduced revenues (comparing the number of lease shifts driven in the last five months of

---

5. Needless to say, if the pending appeal results in the Court of Appeals' reversal of that decision before the damages part of the present case is resolved, all bets are off.

1979 with the number of shifts driven in the last five months of 1980); and

2. each company's assertedly-reduced operating costs based on the lower number of miles driven in 1980.

"Lost profits" are then derived by subtracting the savings in operating costs from the lost revenues.

■ Unions do not tender evidence to challenge Companies' methodology or the resulting calculations.[6] Instead Unions contend their picketing did not "cause" Companies' damages. *Feather v. United Mine Workers of America*, 711 F.2d 530, 537 (3d Cir.1983) (citations omitted) states the principle on which Unions rely:

As the words "by reason of" make clear, section 303(b) requires that there be a causal nexus between the unlawful secondary activity and the injury suffered by the plaintiff.... If the plaintiff would have been harmed regardless of the section 8(b)(4) violation, then of course there can be no recovery.

In that respect Unions urge:

1. Companies have not met their burden of establishing the non-existence of a genuine issue of material fact as to the cause of their damages.

2. Other factors unrelated to Unions' picketing contributed to the reduced number of lease shifts driven in 1980.

Those arguments preclude any award of damages to Companies on the current motion.

Though Companies' affidavits speak to their lost profits, nothing in those affidavits establishes the required causal connection between the Unions' boycott and the reduced results. Companies retort that

linkup is provided by Board's finding (P. Ex. A):

The picketing activity was effective in reducing the number of cabs leased by the LCDs from the Charging Parties.

But on its face that statement does not *quantify* the extent to which Unions' activities caused a reduction in Companies' lease shifts.[7] Companies cannot pin *all* their claimed damages on that slender reed.

That alone defeats Companies' summary judgment motion for damages. Even were that not the case, however, Unions have also come forward with enough evidence to create a genuine issue of material fact as to damages.

First, Unions point out the number of shifts driven for both Checker and Yellow began declining in 1979—even before Unions' picketing began (Def.St. ¶¶ 15–16, 20, 23)—and continued to decrease in 1981—after Unions' boycott ended (*id.* ¶¶ 17, 18, 21, 22). That general downward trend clearly suggests at least part of Companies' lost profits stemmed from factors other than Unions' boycott.

Second, Unions document several increased expenses incurred by LCDs that decrease the cab drivers' ability to earn money:

1. Checker increased its lease rate between 1979 and 1980 (Collins Dep. 51).

2. Gasoline prices increased 39% in 1980 (Def.St. 30).[8]

3. During 1980 the Transaction Tax charged by the City of Chicago increased from $.60 to $2.62 per day (Yellow Stip. Ex. C).

---

**6.** Unions Mem. 15 does try to attack Companies' claimed lost profits, stating Companies' calculations might have:

    1. failed to exclude certain lower costs resulting from fewer shifts; and

    2. included increased costs resulting from damage done to cabs in non-picketing violence.

But Rule 56 requires evidence rather than mere assertions, and Unions have not submitted admissible evidence to raise a fact issue as to those items (even with the benefit of favorable inferences).

**7.** ALJ Ohlbaum's initial decision also stated Unions' activities had caused "substantial losses of revenues" to Companies. But that decision itself (at n. 8) referred to Companies' losses as "estimated." Hence Board itself never purported to quantify Companies' damages.

**8.** Unions derive that statistic from the *Statistical Abstract of the United States* at 475 (105th ed. 1985). Companies have not challenged the admissibility of information drawn from that source.

Such increased expenses affect a cab driver's decision to lease a cab (Feldman Dep. 39–40). Hence economic factors other than Unions' boycott could reasonably account for Companies' decreased revenues. That uncertainty independently bars summary judgment in Companies' favor on the issue of damages.

Because a trial is thus required on the damages question, any rulings on the remaining issues posed by the parties (including mitigation of damages) would be better deferred until they can be dealt with in the trial context. No inference should be drawn either way from the failure to address those questions now.

### Conclusion

There is no genuine issue of material fact, and each of Checker and Yellow is entitled to a judgment as a matter of law, on the issue of Unions' liability for violating Act § 158(b)(4). As to Companies' claimed damages, disputed factual issues preclude summary judgment. Companies' motion is denied to that extent.