CHECKER TAXI COMPANY, INC. and Yellow Cab Company, Plaintiffs,

v.

NATIONAL PRODUCTION WORKERS UNION and Production Workers Union of Chicago and Vicinity, Local 707, Defendants.

No. 80 C 6573.

United States District Court, N.D. Illinois, E.D.

Nov. 25, 1986.

Supplement to Memorandum Opinion, and Order Dec. 29, 1986.

Robert E. Haythorne, Geneva, Ill., for plaintiffs.

Jeremiah Marsh, Michael M. Conway, Antony S. Burt, Hopkins & Sutter, Chicago, Ill., for defendants.

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

Checker Taxi Company, Inc. ("Checker") and Yellow Cab Company ("Yelllow") (collectively "Companies") initially sued National Production Workers Union and Production Workers Union of Chicago and Vicinity, Local 707 (collectively "Unions") under the Labor Management Relations Act (the "Act"), 29 U.S.C. §§ 141 to 187,[1] charging Unions conducted a secondary boycott in violation of Act § 158(b)(4). Companies have now moved under Fed.R. Civ.P. ("Rule") 15 for leave to amend their Complaint to drop that six-year-old claim and instead assert (for the first time) Unions' boycott violated Sherman Act § 1, 15 U.S.C. § 1, and Illinois common law. For the reasons stated in this memorandum opinion and order, this Court's ruling on Companies' motion is deferred pending further submissions by the parties.

### Background

Until 1975 Companies employed commissioned drivers to operate their cabs. As statutory "employees" under the Act, the drivers were represented collectively by Seafarers International Union ("Seafarers Union") Local 777. Then in 1975 Companies instituted an optional leasing program described in *Local 777, Democratic Union Organizing Committee v. NLRB*, 603 F.2d 862, 868 (D.C.Cir.1978) (footnote omitted):

---

**1.** All further Act citations will take the form "Act § —," referring to Title 29's numbering rather than the Act's internal numbering.

Leases are given on a day, night or twenty-four hour basis and the driver must post a bond to cover any damage that he may do to the car during its operation. The terms of the lease agreement state that the Company is not required to renew or extend any lease and that it can terminate a lease and repossess the car involved for any violation of a government ordinance or regulation. It also provides explicitly that the driver is a lessee and not an employee, is not required to report his location, complete a trip sheet recording his rides and fares, account for his collections, or maintain his cab in any specific place. The lease contains prohibition on subleasing and imposes a total mileage limit—calculated to ensure that subleasing does not take place—of 250 miles in any twenty-four hour period.

\* \* \* \* \* \*

The fundamental difference between commission and lessee drivers ... is that the former work for the companies and are accountable to them for all sums collected as fares, from which they receive a stated portion as their earnings, while the latter lease their cabs, pay only a single flat rate and work for themselves.

Within 2½ years some 72% of the drivers had chosen to become leased cab drivers ("LCDs") rather than work on a commission basis (*id.* at 868 & n. 10).[2]

Because Companies had instituted the leasing program without consulting the Seafarers Union and refused to recognize that union as the LCDs' bargaining representative, unfair labor practice charges were soon filed against Companies. Ultimately those charges were dismissed when *Local 777, id.* at 880–81 concluded LCDs are independent contractors rather than employees under the Act, so Companies have no legal obligation to bargain with them. In so deciding, the Court of Appeals observed (*id.* at 880, quoting *Morish v.*

*United States,* 555 F.2d 794, 800, 214 Ct.Cl. 166 (1977) (trial judge's recommended decision adopted per curiam):

Thus, each driver was, in essence, a small businessman, either making a profit of [sic] sustaining a loss on his activities, depending on the relationship between the total amount of the fares collected, on the one hand, and the total amount of the expense incurred, on the other hand.

Sometime later the LCDs began to organize with the hope Companies would voluntarily agree to negotiate collectively with them over what they perceived to be increasingly onerous lease terms. In July 1980 a group of 1200 LCDs consulted with Unions to gain the benefit of Unions' expertise in labor organization and collective representation, and in August 1980 those LCDs formed the Leased Taxicab Division (the "Division") within Unions.

On August 7, 1980 the LCDs met and decided to attempt negotiations with Companies and to stop work and picket if Companies resisted. Next day Unions sent letters to Companies' presidents asking them to recognize and deal with the Division. Companies refused. On August 12 the LCDs and some representatives from Unions began picketing Companies' garages with signs reading in various ways:

Please do not lease a cab until an agreement is signed regarding your working conditions.

On Strike Production Workers Union Local 707

Lease Cabs on Strike Production Workers Union Local 707

Lease Cab 707 Drivers 707 on Strike Yellow & Checker Taxi Company

That afternoon the Circuit Court of Cook County issued a temporary restraining order ("TRO") and the picketing stopped. No picketing occurred between August 13 and August 22 while the TRO remained in

---

**2.** Today Companies have an overwhelming majority of LCDs rather than commissioned drivers.

effect. Thereafter the picketing resumed sporadically.

### Litigation

In September 1980 Companies filed (1) a National Labor Relations Board ("Board") unfair labor practice charge against Unions under Act § 158(b)(5) (secondary picketing) and (2) this action under Act § 187, seeking damages for the alleged unfair labor practice (any such damage action is most frequently referred to as a "Section 303 action," after the internal placement of Act § 187 in the Act itself). Additionally Companies sought a preliminary injunction:

    1. in an earlier-filed action brought in this District Court under Act § 160(*l*) to enjoin the alleged unfair labor practice; and

    2. in the state Circuit Court action, alleging Unions, their officers and the LCDs were violating the Illinois Antitrust Act (Ill.Rev.Stat. ch. 38, ¶¶ 60–1 to 60–11) and Illinois tort law (interference with contractual relations).

This Court's colleague Judge Prentice Marshall denied the federally-sought injunction in *Crawford v. Production Workers Union of Chicago and Vicinity, Local 707*, No. 80 C 4819, slip op. at 4–5 (N.D.Ill. Dec. 11, 1980) on the ground Companies did not have "reasonable cause to believe" (Act § 160(*l*)) Unions had violated Act § 158(b)(4) because:

> The leased drivers are tantamount to being employees of the Companies, and the economic pressure which respondents exert against the Companies in order to influence their position with regard to the leased drivers or against the leased drivers in order to influence their position with regard to the Companies is for a primary object.

Companies also lost their bid for a state court injunction because (among other things) there was a lack of evidence sustaining their allegations of an Illinois Antitrust Act violation. That denial was upheld in *Yellow Cab Co. v. Production Workers Union of Chicago and Vicinity, Local 707*, 92 Ill.App.3d 355, 48 Ill.Dec. 153, 416 N.E.2d 48 (1st Dist.1980). In the course of its opinion the Appellate Court specifically posed, though it left unresolved, the question whether Unions qualified for a labor exemption from the antitrust laws—and it did so exclusively by reference to the *federal* labor exemption to the *federal* antitrust laws (92 Ill.App.3d at 357, 48 Ill.Dec. at 155, 416 N.E.2d at 50) (citations to the United States Supreme Court decisions omitted):

> The fact that the drivers are independent contractors does not in and of itself preclude the existence of a legitimate labor dispute which would exempt the defendants' actions from the antitrust laws.... Nor does the fact that an agreement may have an impact on price render the labor exemption inapplicable.... If a union endeavor is intimately related to wages, hours and working conditions, it is beyond the reach of antitrust liability.... We believe that the question of whether the negotiations concerning the lease rate constitute a "legitimate labor objective" should be reserved until the parties have had an opportunity to present all of the evidence on this issue. There is evidence in the record supporting defendants' contention that the purpose of the strike was to improve the lessee drivers' overall working conditions. The testimony at the hearing clearly reveals that lowering the lease rate was one of several grievances which the lessee drivers wished to discuss with the cab companies. At the hearing on the preliminary injunction the defendants presented evidence concerning most if not all of the following grievances: unsafe cabs, breakdowns of cabs, arbitrary assignment of cabs, unauthorized charges against security deposit bonds for tickets, damages, gas, accidents and arbitrary late charges, demands for payoffs to various company employees to obtain operating cabs, payoffs to obtain repair service, payoffs to obtain towing service, payoffs to avoid excessive charges for gasoline, breakdown pay (rebate of rent while the cab is inoperative), shoptime (rebate of rent while the cab is being

maintained), price of the lease, lack of medical and disability insurance, and bullet-proof shields.

As for Companies' third battlefront—the unfair labor practice charge of secondary picketing—on March 9, 1981 Administrative Law Judge ("ALJ") Ohlbaum concluded the picketing did not violate the Act. Nearly four years later (December 14, 1984) a three-member Board panel reversed the ALJ, holding the picketing *did* violate the Act. Collateral estoppel principles therefore caused this Court (in the "Opinion," 636 F.Supp. 201 (N.D.Ill.1986)) to grant Companies' motion for summary judgment as to liability. Opinion, *id.* at 205 n. 5 made plain, however, the potentially precarious posture of Companies' partial victory[3] because of a pending appeal before the Court of Appeals for the District of Columbia Circuit.

On June 13, 1986 that court reversed Board in *Production Workers Union of Chicago and Vicinity, Local 707 v. NLRB,* 793 F.2d 323 (D.C.Cir.1986). As framed by the court, the issue was (*id.* at 324):

whether Section 8(b)(4) ... which for decades has been dubbed the "secondary boycott provision" ... prohibits union involvement in all picketing by or on behalf of independent contractors, even picketing that is not secondary because not directed against a neutral third party.

Finding (*id.* at 324–25) Board had failed to consider whether Companies were neutral parties,[4] the court remanded to Board to apply the correct standard (*id.* at 332):

As we have already explained, ... a neutral is a third party "wholly unconcerned" in a dispute between two other parties. Yellow and Checker are not at all neutral in this sense; the LCDs dispute over contract terms lies precisely and only with the cab companies.

In a final footnote the court said (*id.* at 333 n. 8) (parenthetical phrase in original, bracketed phrase added by this Court):

Our decision does not address, and therefore leaves open the question whether the union's activity at issue here violates another provision of the Act or is illegal under some other state or federal law. *See supra* 325–26 n. 1 (describing pending proceedings in other fora) [most specifically this case].

Because the Court of Appeals had obviously removed the underpinning for any application of collateral estoppel doctrines, this Court promptly vacated its judgment of liability in Companies' favor. Thereafter the parties rode off in different directions:

1. Companies again moved for summary judgment as to liability (a puzzling notion, to say the least, given what the Court of Appeals had done).

2. Unions moved for judgment on the pleadings or, alternatively, for summary judgment.

3. Companies, apparently recognizing they can no longer recover damages for a violation of Act § 158(b)(4), now seek to amend their Complaint to allege an antitrust theory instead (in their Second Amended Complaint):

9. Defendant unions, in combination with their members, conducted a boycott against Plaintiffs which began on August 20, 1980. Implementing that boycott union members declined to rent Plaintiffs' taxicabs. Also, the unions caused Plaintiffs' garages to be picketed to deter prospective lessees from leasing Plaintiffs' taxicabs.

\* \* \* \* \* \*

11. As a result of the acts ... fewer drivers applied to rent Plaintiffs' taxicabs, and fewer taxicabs were available to serve the public.

12. By reason of their acts Defendants restrained trade or commerce in violation of 15 U.S.C. § 1 and tortiously interfered with the rights of Plaintiffs and independent taxicab drivers

---

**3.** Opinion, 636 F.Supp. at 205–07 simultaneously denied Companies' motion for summary judgment as to damages.

**4.** Board had incorrectly held Act § 158(b)(4) proscribes union participation in *all* picketing by or on behalf of independent contractors.

to contract with each other in violation of the common law of Illinois.

### Rule 15 Amendments

This Court's discretion to grant or deny a motion for leave to amend the pleadings (*Knapp v. Whitaker*, 757 F.2d 827, 849 (7th Cir.), *cert. denied*, — U.S. —, 106 S.Ct. 36, 88 L.Ed.2d 29 (1985)) is narrowed by the Rule 15(a) directive that "leave shall be freely given when justice so requires." In exercising its discretion, this Court may consider such factors as (*Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962)):

> undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment....

Unions urge justice requires denial of Companies' motion for two reasons:

> 1. Companies' new pleading effort is legally insufficient on its face to state a Sherman Act § 1 claim because (a) unions are statutorily exempt from the antitrust laws and (b) Companies do not allege a conspiracy or combination between two separate entities.
>
> 2. Companies are guilty of laches: undue delay (six years) in asserting the new claims, with resulting prejudice to Unions.[5]

This opinion treats each of those arguments in turn.

### Labor Exemption from Antitrust Laws

■ There is no question Unions' conduct would be exempt from the antitrust laws if the LCDs were statutory employees under the Act. As *Apex Hosiery Company v. Leader*, 310 U.S. 469, 502–03, 60 S.Ct. 982, 997, 84 L.Ed. 1311 (1940) (brackets in original) explained:

> A combination of employees necessarily restrains competition among themselves in the sale of their services to the employer.... Since the enactment of the declaration in § 6 of the Clayton Act that "the labor of a human being is not a commodity or article of commerce ... nor shall such [labor] organizations, or the members thereof, be held or construed to be illegal combinations or conspiracies in the restraint of trade under the antitrust laws," it would seem plain that restraints on the sale of the employee's services to the employer, however much they curtail the competition among employees, are not in themselves combinations or conspiracies in restraint of trade or commerce under the Sherman Act.[6]

Unions retain that statutory immunity from the antitrust laws if they act in their self-interest and not in combination with nonlabor groups (*H.A. Artists & Associates, Inc. v. Actors' Equity Association*, 451 U.S. 704, 714, 101 S.Ct. 2102, 2108, 68 L.Ed.2d 558 (1981)). Here Unions would have been acting alone (no other group participated in the boycott) for the purpose of improving wages and working conditions of their members (the LCDs)—the paradigmatic example of a labor dispute.

Nor is that the only potential string to Unions' antitrust-exemption bow. *H.A. Artists, id.* at 716 n. 19, 101 S.Ct. at 2109 n. 19 (citation omitted) explains unions may also qualify for a *nonstatutory* exemption:

> Even where there are union agreements with nonlabor groups that may have the effect of sheltering the nonlabor groups from competition in product markets, the Court has recognized a "nonstatutory" exemption to shield such agreements if they are intimately related to the union's vital concerns of wages, hours, and working conditions.

What complicates the issue here is the prior determination in *Local 777*, 603 F.2d

---

**5.** Although Unions do not explicitly attach the "laches" label to their argument, they assert both undue delay and prejudice—the necessary and sufficient ingredients of a laches defense.

**6.** Clayton Act § 6 is codified at 15 U.S.C. § 17.

862 that the LCDs are not statutory employees but rather independent contractors not covered by the Act. Clayton Act § 20, 29 U.S.C. § 52, speaks of the labor exemption as applicable only to "a dispute concerning terms or conditions of employment." And in the later Norris-LaGuardia Act, 29 U.S.C. §§ 101–15,[7] which "re-emphasized and expanded" that exemption (*H.A. Artists,* 451 U.S. at 714, 101 S.Ct. at 2108),[8] N–L Act § 101 instructs courts not to use the antitrust laws to interfere in cases "involving or growing out of a labor dispute." In turn, N–L Act § 113(c) defines "labor dispute" as including:

> any controversy concerning terms or conditions of employment, or concerning the association or representation of persons in negotiating, fixing, maintaining, changing, or seeking to arrange terms or conditions of employment, regardless of whether or not the disputants stand in the proximate relation of employer and employee.

That definition was examined in *Columbia River Packers Association, Inc. v. Hinton,* 315 U.S. 143, 62 S.Ct. 520, 86 L.Ed. 750 (1942), a case involving a dispute "among businessmen over the terms of a contract for the sale of fish" (*id.* at 145, 62 S.Ct. at 521).[9] *Columbia River, id.* at 145–47, 62 S.Ct. at 521–22 (ellipses in original, footnotes omitted) said:

> This definition [of "labor dispute"] and the stated public policy of the [N–L] Act—aid to "the individual unorganized worker ... commonly helpless ... to obtain acceptable terms and conditions of employment" and protection of the worker "from the interference, restraint, or coercion of employers of labor"—make it clear that the attention of Congress was

focussed upon disputes affecting the employer-employee relationship, and that the Act was not intended to have application to disputes over the sale of commodities.

We recognize that by the terms of the statute there may be a "labor dispute" where the disputants do not stand in the proximate relation of employer and employee. But the statutory classification, however broad, of parties and circumstances to which a "labor dispute" may relate does not expand the application of the Act to include controversies upon which the employer-employee relationship has no bearing.

Because *Local 777* has concluded the LCDs are not statutory employees covered under the Act but rather independent contractors, it follows Companies are not "employers" of the LCDs. Moreover, Companies do not themselves pay "wages" to the LCDs but instead enter into lease agreements with them, through which the LCDs make a "profit" or "loss." Thus the question arises whether a dispute between the LCDs and Companies qualifies as a "labor" dispute concerning conditions of "employment," so that Unions' involvement in that dispute is exempt from the antitrust laws. Indeed, as pointed up by the Illinois Appellate Court's perceptive identification of the disputed questions in *Yellow Cab,* the issues between the LCDs and Companies were such as to pose the *nonstatutory* exemption question as well: Were they such as to render Unions' representation of the LCDs "intimately related to the union's vital concerns of wages, hours, and working conditions" (*H.A. Artists,* 451 U.S. at 716 n. 19, 101 S.Ct. at 2109 n. 19)?

---

**7.** All further citations to the Norris-LaGuardia Act will take the form "N–L Act § —," also referring to the Title 29 numbering.

**8.** Although the Norris-LaGuardia Act does not speak of an "exemption" from the antitrust laws (instead it simply bars federal courts from issuing injunctions in cases involving labor disputes), *H.A. Artists, id.* (footnote omitted) emphasized:

> [I]t has been interpreted broadly as a statement of congressional policy that the courts

must not use the antitrust laws as a vehicle to interfere in labor disputes.

**9.** There a group of fishermen (described by the Court, *id.* at 144–45, 62 S.Ct. at 521 as "independent entrepreneurs") formed their own union and then refrained from selling fish to a processor, which refused to comply with their demand that it not purchase fish from nonunion members.

Neither side has seriously considered either question. Companies Mem. 2 describes *United States Steel Corp. v. Fraternal Association of Steelhaulers*, 431 F.2d 1046 (3d Cir.1970) and *Pan Alaska Trucking v. International Brotherhood of Teamsters*, 621 F.Supp. 800 (D.Ala.1985) and concludes (Mem. 3, emphasis in original):

> However, the exemptions apply *only* when the interest of *employees* is involved—but *NOT* when the person performing the work is an independent contracting proprietor and is not an employee of a putative employer.

Rather than attempting to distinguish those cases,[10] Unions Supp. Mem. 4 merely observes they are "inapposite" because Unions here acted unilaterally and not in combination with a business group.

But that "answer" (or even an alternative answer with greater force[11]) really ignores the difficult questions in this case:

**10.** To do so Unions might have examined such matters as (1) the type of concerted activity engaged in by the associations of independent contractors in those cases, (2) the crux of the dispute between the parties there and (3) the relationship between the parties to the dispute. To enable an effective comparison to be made, that kind of inquiry might well have also called for a fuller story of what was at issue *here* than is afforded by the pleadings alone (see the previously quoted language of the Illinois Appellate Court in *Yellow Cab*).

**11.** If the cases on which Companies rely are examined at all carefully, they really support Unions' position rather than Companies'. Both cases recognize the potential antitrust exemption of associations of nonemployees—even such entrepreneurs as truckowners—when they seek to bargain over their own compensation as *drivers* rather than over the rental rate for their equipment (the familiar distinction between the value of services and the return on capital). Each of those cases rejected the exemption because the second factor was at stake there, not the first. But the LCDs here, though not statutory employees, are not entrepreneurial *owners* either—they are lessees rather than lessors of their cabs. In real world terms, the Unions-Companies dispute over lease rates impacted entirely on what the LCDs would earn from rendering services in driving for their passengers. In the familiar process of legal analysis (matching similarities and dissimilarities, see

1. Does the LCDs' status as independent contractors (or some other fact) preclude the dispute between the LCDs and Companies from being a "labor dispute?"

2. Does that independent contractor status (or some other fact) necessarily mean Unions' agreements with the LCDs (even if viewed as a "nonlabor group") are not "intimately related to the union's vital concerns of wages, hours, and working conditions"?

If both those questions are answered "yes," Unions are not exempt from the antitrust laws when they conduct or participate in a boycott solely to benefit the LCDs—despite the fact the LCDs are "members" of Unions.[12] Justice Goldberg (joined by Justice Brennan), concurring in *Los Angeles Meat & Provision Drivers Union v. United States*, 371 U.S. 94, 105, 83 S.Ct. 162, 168, 9 L.Ed.2d 150 (1962), which involved a question related to those in this case,[13] indicated such questions are both open and complex:

Levi, *Introduction to Legal Reasoning* 1–6 & n. 8 (1949)), the situation here comes much closer to the cases that *United States Steel* and *Pan Alaska Trucking* had to distinguish than to the latter two cases themselves.

**12.** Unions Mem. 2 seeks to rely on the holding in *American Federation of Musicians of the United States and Canada v. Carroll*, 391 U.S. 99, 106, 88 S.Ct. 1562, 1567, 20 L.Ed.2d 460 (1968) that where there is "job or wage competition or some other economic interrelationship affecting legitimate union interests between the union members and the independent contractors," the independent contractors do not constitute a "nonlabor" group. Thus a union may combine with or regulate such independent contractors without losing the labor exemption. Unions' reliance on *AFM* is misplaced, however. There is no allegation here of any relationship between Unions' employee-members and independent-contractor-members (the LCDs), or that Unions' purpose was anything other than to obtain better lease terms and perhaps working conditions for the LCDs.

**13.** In *Los Angeles Meat* a group of 35 to 45 Los Angeles area "grease peddlers" (in the business of buying grease from restaurants and then selling it to grease processors) became members of a union. Like the Division in this case, the peddlers formed a "special 'subdivision' of the union" and "were treated as a separate group, distinct from the ... employee members" (371

The Court is not here required to pass upon, and does not pass upon, the existence of the antitrust violation, or whether, as an original matter, the grease peddlers [independent contractors] might properly associate among themselves or affiliate with a sympathetic and genuinely interested union to improve their economic condition. Resolution of such issues would require careful and detailed consideration of federal labor policy, the scope of the antitrust exemption afforded labor organizations by §§ 6 and 20 of the Clayton Act and the Norris-LaGuardia Act, as interpreted by *United States v. Hutcheson,* 312 U.S. 219, [61 S.Ct. 463, 85 L.Ed. 788] and, in addition, the applicability here of the doctrines enunciated by this Court in cases such as *Columbia River Packers Association, Inc. v. Hinton,* 315 U.S. 143, [62 S.Ct. 520, 86 L.Ed. 750] and *Allen Bradley Co. v. Local No. 3,* 325 U.S. 797 [65 S.Ct. 1533, 89 L.Ed. 1939].

It is properly the lawyers' task, not this Court's, to address those questions in the first instance (including the closely-related subject of how fact-bound, rather than pleading-answerable, the questions may be). Accordingly the parties are directed to deal with those issues in the subsequent memoranda ordered at the end of this opinion. Companies should also address Unions' argument (Supp. Mem. 5–6) that the Complaint is insufficient because it does not allege a conspiracy between two or more separate entities.[14]

That direction has, of course, telegraphed this Court's conclusion that Unions' laches argument is not dispositive at this moment either. Some explanation is due on that score.

### Laches (or Delay Alone)

Unions make a strong case for barring Companies' amendment on laches (or perhaps simply delay) grounds. Companies were unquestionably aware of a potential cause of action under the antitrust laws as early as 1980, when their Illinois state court suit for an injunction against Unions alleged a violation of the Illinois antitrust statute. Now—six years later—Companies seek for the first time to assert that theory in a federal forum.

■ Certainly six years is undue delay—at least absent some justifiable reason for that delay.[15] That is especially true in light of the purpose of Section 15(a) (6 Wright & Miller, *Federal Practice and Procedure: Civil* § 1473, at 375 (1971)):

---

U.S. at 97, 83 S.Ct. at 164). According to the Court (*id.* at 98, 83 S.Ct. at 164):

> There was no showing of any actual or potential wage or job competition, or of any other economic interrelationship, between the grease peddlers and the other members of the union.

At the instigation of the union's business agent, and for the purpose of increasing the price margin for grease, a plan of price fixing and allocation of business was carried out. That led to a District Court decree terminating the membership of the peddlers in the union because the District Court found "only the support of the Union and the powerful weapons at its command enabled the peddlers and the Union together to destroy free competition in the purchase and sale of waste grease" (*id.*). Before the Supreme Court the sole issue was whether it was within the District Court's power to order that particular remedy—a question answered in the affirmative.

**14.** Because Unions Supp. Mem. was the last one submitted, Companies have not had the opportunity to speak to that argument. Further on the subject of issues to be dealt with (or, more accurately, not to be dealt with), Unions Supp. Mem. 2 n. correctly points out there is no reason to examine the sufficiency of Companies' Illinois common law claim at this stage of the proceedings. If this Court refuses to permit Companies to add the Sherman Act claim, pendent jurisdiction for the state law claim will not exist.

**15.** Because the relation-back provisions of Rule 15(c) spare Companies' antitrust claim from dismissal under the otherwise applicable statute of limitations, that independent bar to their cause of action is inapplicable. All the same, on the subject of *delay* it is surely relevant that Congress has decided four years is the outside date for bringing an antitrust action (15 U.S.C. § 15(b)). Compare the similar use of a related statute of limitations to inform the proper measure of the delay factor for laches purposes in the patent field (see, e.g., *Naxon Telesign Corp. v. Bunker Ramo Corp.,* 517 F.Supp. 804, 807–08 n. 2 (N.D.Ill.1981) and cases cited there, *aff'd,* 686 F.2d 1258 (7th Cir.1982)).

The function of Rule 15(a) ... is to enable a party to assert matters that were overlooked or were unknown to him at the time he interposed his original complaint or answer.

*Johnson v. Sales Consultants, Inc.,* 61 F.R.D. 369, 371 (N.D.Ill.1973) denied leave to amend a complaint to allege an antitrust action (instead of a fraud action) for precisely that reason:

The power of a court to permit amendments to a complaint should not be used to completely change the theory of the case after the case has been submitted to the Court on another theory without some showing of lack of knowledge, mistake or inadvertence or some change of conditions over which that party had no knowledge or control.

Companies have suggested no reason for their six-year wait—and the fact they have now lost on the legal theory they chose to pursue instead of an antitrust claim is scarcely a justification.

Such delay alone *might* perhaps be enough to preclude Companies' effort to change their lawsuit now, even if the other branch of a technical laches defense (resulting prejudice) were somehow absent. But that would pose a more troublesome issue, and Companies have not had the opportunity to respond fully to Unions' assertions of such prejudice.

Thus Unions Mem. 5 points out, as a general matter, that even if it is able to locate required witnesses (many of the LCDs no longer operate cabs for Companies) their memories will have faded. Moreover Unions Mem. 5–6 asserts certain individuals who could have been named as cross-defendants by Unions (to compel contribution to any judgment) have not been, and now cannot be, joined as parties.

Unions Supp. Mem. 7–8 also points out the difference between the old and new causes of action. To defend against antitrust charges, Unions will be called on to deal with the presence or absence of an anticompetitive effect—requiring an analysis of the entire taxicab industry and the leasing program up until and including 1980. According to Unions, the industry has "substantially changed" since 1980, making that analysis quite difficult.

In addition, Unions Supp. Mem. 8 notes the necessary focus now (but not before) on Unions' intent, based on the requirement that Companies must show "knowing participation in a common scheme or design between two or more parties" to prove their antitrust claim. Finally Unions Mem. 5–6 urges because all prior discovery was directed toward defending an unfair labor practice charge, it would have to be redone to focus on a complicated antitrust claim.

That last point is surely well-taken. Companies Mem. 8 merely asserts Unions will not be prejudiced because:

All of the facts necessary to support the proposed amended complaint were tried in the NLRB proceedings or are contained in company records copies of which are in Defendants' possession.

Such a slapdash effort to minimize the problem is unpersuasive. *McCann v. Frank B. Hall & Co.,* 109 F.R.D. 363, 368 (N.D.Ill.1986) (emphasis in original) explains the difficulty that can arise when the theory of a case is changed:

The plaintiff's attempt to shrug off the amount of additional discovery necessitated by the amended complaint is unconvincing. [Plaintiff] mistakenly assumes that just because the tort theories involve similar claims that have already been raised as contract claims, no additional discovery will be necessary. This assumption belies the fact that parties conduct discovery—depositions, interrogatories, document requests, etc.—in order to obtain information regarding the claims in a complaint. The parties pursue discovery consistent with their respective theories of the case, *as they are framed in the pleadings.* If the pleadings change, the theory of the case also changes, and the parties' approach to discovery can shift dramatically.

Although Unions have provided persuasive reasons for denying leave to amend based on laches (or maybe even delay

alone), in fairness this Court cannot decide the motion on that ground until Companies have had the opportunity to respond. Ruling is therefore postponed to permit such a response.

### Conclusion

This Court defers ruling on Companies' motion for leave to amend their Complaint until both sides have had the opportunity to round out their submissions in the areas identified in this opinion. They are directed to file supplemental memoranda to that end on or before December 9, 1986. This case is set for a status hearing (and, barring unforeseen difficulties, final decision on Companies' motion) December 30, 1986 at 9:15 a.m.

## SUPPLEMENT TO MEMORANDUM OPINION AND ORDER

■ This Court's November 25, 1986 memorandum opinion and order (the "Opinion")[1] deferred ruling, pending further submissions by the parties, on Companies' motion for leave further to amend their Complaint (more accurately, to alter it entirely) to assert an antitrust claim. Those submissions are now in hand, and for the reasons identified in the Opinion and this supplement:

1. Companies' motion is denied.
2. This action is dismissed.

Of course Opinion at 566 acknowledged Rule 15(a)'s directive[2] narrows judicial discretion to grant or deny leave to amend pleadings. At the same time this Court noted it may consider the following factors (among others) in exercising its discretion in that regard:

1. Companies' undue delay in seeking leave to amend;
2. resulting prejudice to Unions; and
3. futility of the amendment.

Opinion at 569 observed Unions had made a "strong case for barring Companies' amendment" based on the first two factors, but deferred ruling so Companies would have the opportunity to respond. Nothing in Companies' latest memorandum, however, has refuted that strong case.

As Opinion at 569–70 said, Companies' six-year delay in seeking leave to assert an antitrust claim is particularly troubling. Two obvious reasons for such concern were identified in the Opinion's call for further input from the parties:

1. Companies were necessarily aware back in 1980 (when they filed a state antitrust claim) of a potential cause of action under the federal antitrust laws (Opinion at 569).

2. Rule 15(a)'s function is to enable parties to assert matters that were overlooked or unknown when the pleadings were first filed (Opinion at 569).

Yet Companies Mem. 3 does not dispute either point. It says simply:

[T]he six year delay was warranted and justifiable because the parties concurred and the Court condoned continuances pending resolution of the NLRB case.

That is patently absurd. All this Court continued, at the parties' joint behest, was Companies' action for damages resulting from Unions' alleged unfair labor practice (a secondary boycott). It was clearly an efficient use of the litigants' and the Court's resources not to proceed with that action until the NLRB had determined whether Unions had in fact committed that unfair labor practice.

Companies' *antitrust* claim is an entirely different matter. Nothing stopped Companies from asserting and then litigating that claim immediately—regardless of the pending NLRB proceeding.[3] There was every

1. This opinion (1) will assume familiarity with the factual statement in the Opinion, (2) will follow the same usage of defined terms and (3) will refer to the parties' most recent memoranda as "Unions Mem.—" and "Companies Mem.—."

2. "[L]eave [to amend the pleadings] shall be freely given when justice so requires."

3. That differentiates this case from *Components, Inc. v. Western Electric Co.*, 52 F.R.D. 379 (D.Me. 1971), on which Companies seek to rely. There the court had stayed discovery and trial of patent misuse issues (*id.* at 381–82). It was thus

incentive for them to do so—among other reasons, that claim would have carried a treble damages price tag if they were successful. Companies made a deliberate choice not to follow that path. And as Opinion at 569–70 noted, it is certainly no excuse that Companies have now lost (after six years) on the legal theory they chose to pursue instead of an antitrust claim. To paraphrase Robert Frost's *The Road Not Taken:*

> [They] took the one less traveled by, And that has made all the difference.

Next Companies Mem. 2 (quoting from this Court's laches discussion in *Naxon Telesign Corp. v. Bunker Ramo Corp.,* 517 F.Supp. 804, 808 (N.D.Ill.1981), aff'd, 686 F.2d 1258 (7th Cir.1982)) says undue delay in itself—absent resulting prejudice to Unions—is an insufficient basis for denying leave to amend. Laches, of course, does require both delay and prejudice. But before this opinion turns to consideration of the latter factor, it is worth a brief (really parenthetical) look at the question whether Rule 15(a) would allow denial of leave to amend solely because of Companies' completely unjustified six-year delay in seeking such leave. In that respect there is some case law suggesting a "no" answer to the question, but none of the cases this Court has reviewed suggests any reason for such a per se rule in light of the now-familiar language in *Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962) (quoted in Opinion at 566).[4]

That, however, is a wholly academic inquiry. There is no question but that Unions would be materially prejudiced by Companies' unexplained and unjustified delay. Review of such prejudice will occupy the balance of the discussion in this opinion. In that respect, Opinion at 570–71 summarized what Unions had then identified as the sorts of prejudice they would

assertedly suffer. Each of those factors has now been fleshed out a bit further.

First, Unions Mem. 14 reiterates Unions are unable to join the LCDs as co-defendants, to compel contribution to any judgment that might be awarded for violation of the antitrust laws, because Companies did not assert the antitrust claim until after the statute of limitations had run. Companies are scarcely in a position to challenge Unions' characterization of the LCDs as potential co-defendants: Companies' own state antitrust claim (filed back in 1980, when their federal claim was equally assertable) did join the LCDs as defendants (as alleged co-conspirators with Unions). Companies Mem. 5 can offer only a lame response:

> But that is their [Unions'] fault. They could have joined co-defendants in this damage action as soon as the complaint was filed in 1980.

That kind of second-guessing is both impermissible and unpersuasive. Companies' 1980 complaint sought damages only for claimed secondary boycotting in violation of federal labor laws. On that score Unions had common cause with their members, the LCDs, and can scarcely have been faulted for not joining them as co-defendants. Had Companies asserted an antitrust claim back in 1980, however, Unions would have been on notice of the need to join the LCDs as co-defendants, and they could have done so in a timely fashion. Companies, having deprived Unions of that option by inexcusable delay, will not now be heard to say it was an option Unions would not have exercised.

Unions also say they will be prejudiced by the need to engage in extensive new discovery focusing on certain elements of an antitrust claim not previously at issue: (1) Unions' and the LCDs' intent in boycotting and (2) the presence or absence of an anticompetitive effect. Unions complain

---

both understandable and proper for the court to permit plaintiff, at a later date, to amend its complaint to assert the invalidity of the patents that had allegedly been misused.

4. See *Textor v. Board of Regents,* 711 F.2d 1387, 1391 (7th Cir.1983); *UNR Industries, Inc. v. Continental Insurance Co.,* 623 F.Supp. 1319, 1324–25 (N.D.Ill.1985) (discussing *Textor* in light of *Foman* ) and cases cited there.

not only of the considerable work involved (they foresee the need to perform an analysis of the taxicab industry up until and including 1980) but also of the likelihood witnesses will be either unavailable (if no longer affiliated with Unions) or unable to recall critical information.

Companies disagree. They cite but a single case, *Los Angeles Meat & Provision Drivers Union v. United States*, 371 U.S. 94, 83 S.Ct. 162, 9 L.Ed.2d 150 (1962)[5]—one in which the litigants *stipulated* defendants had engaged in price fixing in violation of Section 1 of the Sherman Act (*id.* at 95–96, 83 S.Ct. at 163). From that case Companies Mem. 5–6 seeks to reason:

1. Unions in this case also engaged in price fixing.

2. Price fixing is a per se Sherman Act violation.

3. Therefore Companies need not show "the magnitude of [Unions' conduct] on commerce."

In Companies' view this case can thus be disposed of quite easily and without further discovery.

Though that attempted syllogism may betray Companies' need for a full-course lesson in antitrust law, this Court need not engage in any such extended analysis. Suffice it to say:

1. Companies' proposed Second Amended Complaint has not alleged Unions engaged in price fixing, and Unions deny any such activity.[6] Further discovery would obviously be needed to enable the parties to develop and to present the evidence needed to prove or disprove any such allegation.

2. "Group boycotts" are a per se Sherman Act violation only if used to enforce agreements that are themselves illegal (*Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1109 (7th Cir.1984); *Imperial Construction Management Corp. v. Laborers International Union of North America, Local 96*, No. 85 C 2390, slip op. at 7–8 (N.D.Ill. May 28, 1986) [Available on WESTLAW–DCTU database]). Here there is considerable difficulty even identifying any such "agreement" (let alone an illegal one) between Companies and the LCDs apart from the "boycott" itself—and if the LCDs' membership in Union were somehow viewed as the offending "agreement," the decision of the Court of Appeals for the District of Columbia, by rejecting Labor Management Relations Act liability, removed the only identifiable source of its possible illegality.

In sum, Companies are wholly in error in characterizing both the present posture and the inevitable result of their proposed antitrust claim. If leave to assert that claim were granted, Unions—having finally prevailed (after 6 years) against the secondary boycott claim—would be forced suddenly to change gears and to engage in further (possibly extensive) discovery to defend against an antitrust claim. Their ability to engage in that defense and to seek contribution for any potential liability has been seriously impaired by the passage of so much time.[7] Considering Companies' utter lack of any excuse for delaying so long

---

**5.** See the description of that case in Opinion at 568–69 & n. 13.

**6.** Second Amended Complaint ¶ 11 alleges only that "fewer drivers applied to rent [Companies'] taxicabs, and fewer taxicabs were available to serve the public." Unions Mem. 4 n.* denies Unions and the LCDs engaged in price fixing, characterizing their activity instead as:

> primary picketing of the Cab Companies because of their complete refusal to negotiate over the terms of the lease and the working conditions of the drivers.

**7.** Companies' Memorandum is shot through with misunderstanding or mischaracterization (or both) of the relevant issues. Thus Opinion at 569 n. 15 referred to the four-year limitation period for antitrust claims, not as *barring* Companies' current effort as a matter of law (Rule 15(c) would prevent that result) but "to inform the proper measure of the delay factor for laches purposes." Companies Mem. 3 simply misses the point, labeling that well-established concept as an "effective repeal[ ]" of Rule 15(c). But see *Naxon Telesign*, 517 F.Supp. at 807–08 & n. 2, 686 F.2d at 1265 (passage of limitations period creates presumption of unreasonable prejudicial delay, shifting burden to plaintiff to excuse delay).

before newly asserting their long-understood potential antitrust claim, this Court sees no reason to require Unions to endure further litigation.[8]

Only a word or two needs to be said about the possible caboose to Companies' now-rejected antitrust train. Proposed Amended Complaint ¶ 12 also alleges Unions "tortiously interfered with the rights of [Companies] and independent taxicab drivers to contract with each other in violation of the common law of Illinois." Without pausing to identify possible substantive flaws in that added theory of liability (such as the privilege that might likely attach to such claimed interference), it is enough to say:

1. That claim, lacking any independent basis for federal jurisdiction, is now pendent to nothing at all and must fall of its own weight here.

2. All the laches arguments in the Opinion and this opinion apply with equal if not greater force to that claim (what stopped Companies from asserting the state-law tortious interference claim in the state court lawsuit they actually brought—an opportunity that was not available to Companies in that state lawsuit for their federal antitrust claim?).

Leave to assert that claim now is also denied.

### Conclusion

Companies are denied leave to file their Second Amended Complaint. Moreover, their effort to switch their theory entirely to the antitrust arena has recognized the unsustainability of their present claim in light of the decision in *Production Work-*

ers Union of Chicago and Vicinity, Local 707 v. NLRB, 793 F.2d 323 (D.C.Cir.1986). This action is dismissed in its entirety.

---

8. Having denied Companies leave to amend on laches (delay-plus-prejudice) grounds, this Court need not reach the more complex labor exemption issue posed but left unresolved in the Opinion. There too Companies Mem. 6–8 is less than persuasive in responding to the analysis and questions posed in Opinion at 566–69. Unions Mem. 5–12 does a better job on that score, including (in addition to its discussion of the directly relevant cases discussed in Opinion at 566–69) its citation to *Bodine Produce, Inc. v. United Farm Workers Organization Committee,* 494 F.2d 541, 557 (9th Cir.1974) and

*Local 24, International Brotherhood of Teamsters v. Oliver,* 358 U.S. 283, 79 S.Ct. 297, 3 L.Ed.2d 312 (1959) (each of which arguably has some potential relevance for the exemption issue). But the labor exemption question remains fact-bound as to the underlying disputes between Companies and the LCDs (see Opinion at 569, and the language of the Illinois Appellate Court in *Yellow Cab* quoted in Opinion at 564). Because the denial of leave to amend is so solidly grounded in established laches principles, there is little to be gained by exploring the uncharted reaches of the exemption issue.